Argued September 13, affirmed October 10, 1950

# ATKINSON *v.* FAIRVIEW DAIRY FARMS,

### A CORPORATION

### 222 P. (2d) 732

*Nels Peterson* argued the cause for appellant. On the brief were Green, Landye & Peterson and Donald S. Richardson, all of Portland.

*David Fain* argued the cause for respondent. With him on the brief were Black & Kendall, all of Portland.

Before Brand, Acting Chief Justice, and Bailey, Hay, Latourette and Warner, Justices.

## LATOURETTE, J.

Plaintiff, a driver for the Dairy Co-operative Association, brought action against defendant, Fairview Dairy Farms, a corporation, for assault and battery. It is alleged that one Hensley, an employee of defendant, assaulted plaintiff while plaintiff was delivering milk to the defendant corporation. It appears that all parties above mentioned were, at the time of the episode, under the Workmen's Compensation law. By reason thereof, defendant filed a supplemental pleading invoking a defense under the following provision of § 102-1752, O. C. L. A.:

"*  *  * If the injury to a workman is due to the negligence or wrong of a third person not in the same employ, the injured workman * * * may elect to seek a remedy against such third person; *provided, however, that no action shall be brought against any such third person if he or his workman causing the injury was, at the time of the injury, on premises over which he had joint supervision and control with the employer of the injured workman and was an employer subject to this act. 'Premises', as used in this section, shall mean the place where the employer, or his workman causing the injury, and the employer of the injured workman, are engaged in the furtherance of a common enterprise or the accomplishment of the same or related purposes in operation.*" (Italics ours).

The trial court, pursuant to said § 102-1752, O. C. L. A., determined that under the facts adduced, the provision of the law above adverted to applied and found in favor of the defendant; hence this appeal. We will hereinafter refer to the defendant as the "dairy" and the Dairy Co-operative Association as the "co-op."

Plaintiff's assignments of error are as follows:

"A.

"The plaintiff, at the time of the injury complained of, was not on the premises over which the defendant, Fairview Farms, had joint supervision and control with the employer of the plaintiff, within the meaning of Section 102-1752 O. C. L. A.

"B.

"Section 102-1752 O. C. L. A. has no application to an action at law to recover damages for assault and battery.

"C.

"The claimed defense is prohibited by the declared public policy of the State of Oregon.

"D.

"Construing Section 102-1752 O. C. L. A. to permit the defendant to bar plaintiff's action at law for injuries intentionally inflicted, renders said section unconstitutional."

The undisputed facts are as follows:

Prior to the altercation between the plaintiff and Hensley, the co-op and the dairy had entered into a written contract wherein the co-op engaged to sell and deliver to the dairy the milk procured from the various farmers belonging to the co-op, such delivery to be

made at the plant of the dairy located in Portland, Oregon. The dairy engaged to pay to the co-op for such milk the minimum prices fixed by the State Department of Agriculture.

Prior to the delivery of the milk to the dairy, the co-op sends its driver out to gather in milk from the various farmers belonging to the co-op, each farmer having a designated number for his cans. The driver then takes the milk to the dairy's receiving room, being a space about 20 by 18 feet in dimension. The driver then backs his truck up to the receiving room platform which is flush with the bed of the truck. At this point the driver removes the cans of milk from the truck and scoots them across the floor of the receiving room to the weighing scale where a dairy employee, sometimes with the assistance of the driver, pours the milk into a big tub preparatory to weighing the milk. Each farmer's milk is weighed separately so that if any particular farmer has more than one can of milk to be weighed, the driver sees to it that each farmer's cans are assembled and their contents poured into the weighing tub as a unit.

After the milk is weighed, the lever is pulled by the dairy, and the milk runs through a pipe into a vat; thereafter, the empty cans are taken by the dairy to another part of the receiving room and cleansed. The cans are then returned to the floor; the co-op assembles and moves them back to the truck for return to the various farmers.

During the process of weighing, the co-op driver checks the weights to see that each farmer gets his just quota, and on occasion, the co-op runs tests of the milk to determine the butterfat content.

The driver, during the can washing process, keeps tab to see that the cans are properly washed, and if he protests, the dairy rewashes the cans to the satisfaction of the driver.

After the milk is weighed, the dairy makes a record in duplicate, gives one to the co-op and retains one to itself. Each record contains the can number of the shipper (farmer), the number of cans belonging to him and the weight of his milk. It is important that the proper weights for the various farmers are tabulated as, in most instances, this is the only record the farmer has of the weight of his milk.

Hensley, the person alleged to have assaulted the plaintiff, was called as a witness by the plaintiff and testified as follows:

"Q. When did you first see Mr. Atkinson on September 12, 1946?

"A. I couldn't give you the exact time. Sometimes they are on time and sometimes they are late.

"Q. The approximate time?

"A. Between nine and ten o'clock.

"Q. What was the occasion that he was there?

"A. Pardon?

"Q. What was the occasion that he was there? How did he happen to be there?

"A. Delivering the milk.

"Q. After he arrived were the milk cans unloaded?

"A. Yes, that is his job.

"Q. And did you assist in that work?

"A. I did.

"Q. What was your specific job?

"A. Well, to put the cans up in line if the driver doesn't do it, and just general cooperation to get them in the lineup to the scales. We try to get them up to lift them straight up into the scales."

It was after this, during the washing of the cans, that the driver protested the manner in which Hensley put the cans down on the floor; whereupon, the fracas started, which is the basis for this action.

It is important to note that, during the entire operation in the receiving room, the driver and the dairy's employees commingle in the work in which they are respectively engaged, and that there is no other operation going on at the time.

The basic questions here are: (1) Did the co-op have joint supervision and control of the premises (the receiving room) with the dairy? and, (2) Were the co-op and the dairy at the time in question engaged in the furtherance of a common enterprise for the accomplishment of the same or related purposes in operation? Taking up the last proposition first, it seems obvious that the co-op and the dairy were engaged at the time and place in the furtherance of a common enterprise or the accomplishment of the same or related purposes in that they both occupied the premises and performed component parts of a general undertaking.

In the case of *Inwall v. Transpacific Lumber Co. et al.,* 165 Or. 560, 571, 108 P. (2d) 522, to which we will refer more fully later, the court said:

"To become 'engaged in the furtherance of a common enterprise' it is not essential that the workmen formally enter into an agreement to the effect.

All that is essential is that they occupy the same premises and perform component parts of a general undertaking.''

The debatable question is whether or not at the time and place in question there was joint supervision and control of the premises. The dairy, being the owner and operator of the plant, under the facts above stated, certainly had control of the premises, so the matter resolves itself into the question of whether or not the co-op shared with the dairy supervision and control of the premises.

This question of joint supervision and control of the premises under the act being considered has been before the court in only three cases, i.e., *Inwall v. Transpacific Lumber Co.,* supra, *Brown v. Underwood Lumber Co.,* 172 Or. 261, 141 P. (2d) 527, and *French v. Christner et al.,* 173 Or. 158, 135 P. (2d) 464, 143 P. (2d) 674. The facts in the Inwall case, supra, are as follows: the workman, a stevedore and an employee of the steamship company, was injured on the dock belonging to an outside party when lumber fell on him which was being delivered to the dock to be hoisted by the stevedore and fellow employees into the hold of the vessel at Port Orford. He brought action against the lumber company for damages, whereupon, this court held on appeal that he was barred from a third party action because of the provisions of § 102-1752, O. C. L. A., supra. The *modus operandi* was that the lumber company brought the lumber in carriers to the edge of the dock adjacent to the vessel where it deposited the same. While this operation was going on, the stevedores stepped aside until the lumber was unloaded; whereupon, they took charge by placing the lumber in a sling and attaching the sling to the vessel's

tackle, preparatory to its being hoisted into the hold of the vessel. The stevedores had nothing to do with the transportation of the lumber, nor did the lumber company's employees have anything to do with the hoisting of the lumber into the hold of the ship, each working independently of the other, but both occupying the dock and plying their respective employments. The only control the plaintiff's employer exercised over the dock in that case may be divided into two phases: (1) the occupation of the dock while the lumber was being unloaded, and (2) placing the sling around the lumber and attaching the sling to the vessel's tackle preparatory to its being hoisted onto the ship. The only control the lumber company had of the wharf was while it was occupying the same, trucking lumber over it and depositing the lumber at the edge of the same. This is the language of the court in that case:

"It is our belief that the evidence in this case, which shows that the wharf was under the joint supervision and control of both employers, is entirely unrefuted. Nothing in the record affords any basis for an inference that either of them failed to exercise control there. Nor does it afford any basis for an inference that the one exercised less control than the other. There is certainly no room for believing that some one other than these two employers was in charge of the wharf. The only legitimate inference which can be drawn from the record indicates that the wharf was under the joint supervision and control of the plaintiff's employer and the employer of Cawley."

The French case, supra, is not of importance to us in this case as the injuries complained of occurred on a public highway in a collision between three vehicles, over which highway the State Highway Commission has supervision and control.

■ It seems to us that the Inwall case, supra, is decisive of the case at bar for, under the facts in the instant case, the plaintiff, driver of the co-op, participated in many more activities in the processing of the milk than did Inwall in the loading of the lumber onto the vessel. As plaintiff's own witness said, there was "general cooperation to get them (the cans) in the lineup to the scales."

Plaintiff tries to distinguish the Inwall case from the case at bar in the following language:

"In this case the gangs of sailors who were acting as longshoremen, and the gangs of the lumber company, were all mingling on the dock, the work being directed by supervisory employees of both companies, none of which facts appear in this case."

Quite contrary to plaintiff's assertion, there was a continuous intermingling of the employees of both employers in the routine of processing the milk. It is pointed out by the court as follows: "* * * the employees with whom we are concerned were not in two separate places, but were on the dock intermingling in the prosecution of their work and within arm's length of one another." As to the supervisory employees, it is true that the carrier crew had a foreman, and the stevedores were under the supervision of the captain of the ship; however, in principle it would make no difference whether the premises were controlled by supervisory employees or by the employees themselves. In either instance, the employees represented the employer, and the control in each instance would depend on the nature of the work involved rather than on who in particular was directing the same.

Plaintiff attempts to distinguish the case of *Brown v. Underwood Lumber Co.,* supra, from the case at

bar. In that case, plaintiff, a log scaler, was injured on premises belonging to his employer and which were being used by the defendant in its logging operations. Under the contract between the employers the logs were to be scaled at the site of the logging operations, and while Brown was thus engaged, a log rolled off the defendant's truck and killed him. When Brown was scaling the logs as they were loaded, he would signal from time to time the footage of the logs to the loader of the Underwood Lumber Co., so that there would be no overweight in violation of the law. Plaintiff says:

> "In this case therefore, we have the situation of the employer of the injured man actually assisting in the supervision of the work that the defendant was doing. No such facts appear in this case."

On the contrary, in the case at bar the injured man (plaintiff) actually assisted in the work that the defendant was doing by helping the defendant's employee lift the milk cans from the floor and pouring their contents into the vat.

The decision in the Brown case, however, did not turn on the "assisting" in the operations. This court said:

> "Having concluded that Brown, in scaling the logs, was taking part in a logging operation, it seems clear that his employer had joint supervision and control over the premises in question and was engaged in the common enterprise of logging."

In his brief appellant has gone quite extensively into the history of the Workmen's Compensation Act of this state in order to point out to the court the intention of the legislature in enacting the provision of

the law being considered. The act itself does not define "joint supervision and control * * * common enterprise or the accomplishment of the same or related purposes in operation;" however, we have a yardstick in the Inwall case, supra, as to the meaning of the above quoted language, and, for that reason, it will serve no purpose to analyze the various workmen's compensation statutes over the years.

Plaintiff has cited a number of cases from other jurisdictions, but the statutes involved in those cases and the factual situations were different from ours. It will accomplish no useful purpose to analyze these cases. As has hereinbefore been pointed out, this court has placed its interpretation on the provisions of the statute in question.

■ It is next claimed that § 102-1752, O. C. L. A., has no application to an action at law to recover damages for assault and battery. Plaintiff urges that by virtue of § 102-1753, O. C. L. A., a workman has a right of action against *his employer* if the injury to the workman results from the deliberate intention of his employer to produce such injury. Section 102-1752, O. C. L. A., gives the workman the right to sue a third party if his neglect or *wrong* results in the injury to such workman unless at the time of the injury the parties were on premises over which there was joint supervision and control, etc. "Wrong," of course, would include an assault and battery. By an ingenious argument, plaintiff contends that if it be held that the injury complained of occurred on premises over which the two employers had joint supervision and control, etc., the plaintiff would be subject to the direction and control of the dairy, which, in effect, would make the dairy the employer of the plaintiff, which, in turn,

would give the plaintiff the right to sue the defendant under § 102-1753, O. C. L. A. Plaintiff's analytical gymnastic is illogical and untenable.

It is next asserted that defendant's defense is against the declared public policy of the state. The public policy of the state is best declared by the statutes enacted by the legislature. In the case at bar defendant's defense is authorized by § 102-1752, O. C. L. A.

■ Plaintiff lastly contends that to construe § 102-1752, O. C. L. A., as a bar to an action at law for injuries intentionally inflicted would render such act unconstitutional. It is asserted that this would take away plaintiff's remedy by due course of law for injury done him on his person. Art. I, § 10, Oregon Constitution.

The Workmen's Compensation Act has been held on a number of occasions to be constitutional. When plaintiff elected to come under the act, he was given a remedy (compensation) in lieu of the common law remedy he had lost. In passing, the plaintiff, in the instant case, filed his claim with the commission for compensation for his injuries and received compensation for the same. See *Evanhoff v. State Industrial Accident Commission,* 78 Or. 503, 154 P. 106; *Roles Shingle Co. v. Bergerson et al.,* 142 Or. 131, 19 P. (2d) 94; *Bigby v. Pelican Bay Lumber Co.,* 173 Or. 682, 147 P. (2d) 199.

It has been held by our court in a number of cases that when a workman comes under the Workmen's Compensation Act, the compensation afforded by the statute is the exclusive remedy, and that the only common law actions reserved to him are those which are specifically mentioned by statute. See *King v. Union Oil Co.,* 144 Or. 655, 24 P. (2d) 345, 25 P. (2d) 1055;

*Kowcun v. Bybee*, 182 Or. 271, 186 P. (2d) 790; *Matheny v. Edwards Ice Machine & Supply Co.*, 39 F. (2d) 70, 281 U. S. 765, 64 L. E. 1173, 50 Sup. Ct. 464.

Where injuries are received by a workman on premises subject to joint supervision and control, no cause of action for damages is reserved to him. His sole remedy is the compensation awarded him by virtue of the act. He is, therefore, giving up no substantial rights.

Judgment affirmed.