Argued January 8, reversed July 2, petition for rehearing
denied September 3, 1958

# LONG *v.* SPRINGFIELD LUMBER MILLS, INC.

327 P. 2d 421

*Windsor Calkins* argued the cause for appellant. On the brief were Calkins & Calkins, Eugene.

*E. B. Sahlstrom* argued the cause for respondent. On the brief were Thompson & Sahlstrom, Eugene.

Before Rossman, J., Presiding, and Lusk, Warner and *Kester, Justices.

ROSSMAN, J.

This is an appeal by the defendant from a judgment which the circuit court entered for the plaintiff after the jury had returned its verdict for him. The action which he instituted sought damages from the defendant for an injury which the plaintiff suffered July 14, 1955, while at the defendant's log dump. The plaintiff was in the employ of one A. N. Rackley as the driver of a log truck. Rackley, who was in the logging business, supplied the defendant with logs. July 14, 1955, when a truckload of logs, which the plaintiff had brought to the defendant's mill pond, was being unloaded, one of the logs made an unanticipated movement and struck the plaintiff thereby inflicting the injury for which damages are sought. The complaint charged the defendant with (1) failure to exercise due care; (2) failure to comply with the Basic Safety Code promulgated by the Industrial Accident Commission; and (3) failure to comply with the Employers' Liability Act.

Pursuant to ORS 656.324(3), the defendant, by supplementary answer, challenged the right of the plaintiff to bring this action against a third party, that is, this defendant. The supplementary answer alleged:

"At the time of the accident the defendant herein and the employer of the plaintiff, A. N. Rackley, were each contributors to and operating under the Workmens' Compensation Law and the accident occurred on premises over which the defendant herein and A. N. Rackley, had joint supervision and control, and they were engaged in the furtherance of a common enterprise or the accomplishment of the

---

* Resigned March 1, 1958.

same or related purposes in the operation at the time and place of the accident."

ORS 656.154 says:

"* * * no action shall be brought against any such third person if he or his workman causing the injury was, at the time of the injury, on premises over which he had joint supervision and control with the employer of the injured workman and was an employer subject to ORS 656.002 to 656.590.

"(2) As used in this section, 'premises' means the place where the employer, or his workman causing the injury, and the employer of the injured workman, are engaged in the furtherance of a common enterprise or the accomplishment of the same or related purposes in operation."

The defendant's motion that the court determine, before the empanelment of the jury, the merits of the defense which was submitted by the supplemental answer was denied, and the defendant's motions for a nonsuit and for a directed verdict based upon that defense were also denied. Those rulings are challenged by the first, second and third assignments of error. We shall now give attention to the second and third, which are concerned with the merits of the defense.

The part of the evidence which is pertinent to the second and third assignments of error shows that July 28, 1954, A. N. Rackley, plaintiff's employer, and the C. W. Guerrier Lumber Company, to which the defendant is successor, signed a document entitled Log Sale Agreement which we will have frequent occasion to consult. The document, referring to Rackley as the seller, recited: "Seller has heretofore entered into a contract with the United States of America for the purchase of certain O. & C. timber." The timber, its conversion into sawlogs by Rackley, and their purchase by the Guerrier Lumber Company were the subject

matter of the agreement. The latter, referring to the Guerrier Lumber Company as the purchaser, stated: "Purchaser desires to buy and the Seller desires to sell all the merchantable timber designated in said O. & C. contract." The instrument then bound the plaintiff's employer (Rackley)

> "to do all falling, bucking, yarding, loading and hauling of timber at his own expense and to deliver all of said timber to the pond or ponds of the Purchaser in Springfield, Oregon, or to such other pond or place as may be specified by the Purchaser."

The agreement bound Rackley to provide, at his own expense, workmen's compensation or other protection covering all operations. It provided that the purchaser (Guerrier) should make the stumpage payments to the Treasurer of the United States in behalf of the seller and also pay the cost of the right of way to one Fred Lemery "as provided in said O. & C. contract." The agreement required the purchaser to pay the seller for all merchantable logs "delivered in accordance with the terms of this agreement at the rate of $24.35 per thousand board feet." Weekly payment was exacted. Continuing, the paper stated:

> "It is further agreed that when all the logs have been delivered to the Purchaser under this agreement, the total market value of the net scale of all logs taken out by the Seller under said O. & C. contract shall be computed. For the purpose of this computation the market value shall be based upon the following market prices: * * *."

At that point a schedule of prices for Douglas fir peelers and saw logs as well as cedar and hemlock camp run was set forth. The peelers and saw logs were cast into categories of three each, dependent upon their characteristics. It will be noticed that when the com-

putation had been made, the market value of the forest crop which had been harvested from the land would be determined. The agreement continued with this provision:

> "From this total market value, as computed above, there shall be deducted the stumpage paid under the O. & C. contract, the amount paid for right-of-way, under said contract, the total amount paid to the Seller under this agreement, and any other deductions expended by the Purchaser directly in connection with this contract. If the market value is greater than these deductions, above listed, the remaining figure shall be considered a profit and shall be divided equally between the Purchaser and the Seller, with the Purchaser reimbursing the Seller for said fifty per cent (50%). It is understood that if the deductions, above set forth, are greater than the total market value, as above computed, no reimbursement from the Purchaser will be forthcoming to the Seller."

By way of summary, we take note of the fact that the paper entitled Log Sale Agreement required the Guerrier Company to help Rackley finance his operations by paying the Government for the stumpage, and set forth a comprehensive method whereby the parties could ascertain whether the conversion of the trees into logs yielded a profit. If a profit was earned, the paper entitled the Guerrier Company to one half of it.

The contract stated:

> "* * * the relationship of each to the other is that of independent contractors * * * that the parties hereto in no way stand in relationship of master and servant, principal and agent, employer and employee, and that, under the terms of this contract, the Seller is free from any direction or control by the Purchaser in the performance of the services and the delivery of logs required under this

agreement. * * * It is expressly understood and agreed that this transaction is a sale and purchase * * *."

July 14, 1955, the plaintiff drove a truck loaded with logs from Rackley's operations to the defendant's log dump. He had made similar trips two and three times a day in the preceding period. When the plaintiff arrived at the defendant's log dump, as on prior occasions, he first drove to the scaler's shack where the logs were measured. The plaintiff customarily assisted the scaler in this operation by holding one end of the measuring tape. When the scaling was finished, the plaintiff re-entered the cab of his truck and drove 75 to 125 feet north to a place between the log pond, which was to his left or west side, and the dump shack, which was on his right. The dump shack was occupied by one Vernon Harper, an employee of the defendant. As the plaintiff neared the dumping site, Harper directed him so that he would stop at the point where the logs could be dumped to the best advantage. This phase of the operation was called spotting. Along the edge of the log pond was a large log, termed a brow log. Trucks which came to dump logs stopped alongside it. Attached to pilings beneath the brow log were straps, which the industry terms dump straps. They were drawn by Harper from under the brow log, around and over it and then laid beside the brow log in the road. After the truck had been spotted, Harper left the dump shack and, working from the east side of the truck, drew the dump straps, which were lying on the west side of the truck, under the load and over to the east side. Having done that, he attached the straps to a cable that descended from the top of a piece of dumping equipment known as an A frame. The A frame stood between the brow log and the dump shack. It was operated from

the latter. The straps, which were 16 to 20 feet apart at the bottom of the load, came together at the top of the A frame. Harper's duty required him to place the straps in such a position that they would lift the load over the brow log and that none of them would fall upon the truck. Harper would then enter the dump shack and, by operation of an electrical motor and drum, tighten the straps. The cessation of this operation was interpreted by the truck drivers as a signal that the logs were tightly held and that they could remove the binder chains and release the bunk blocks of the truck. A sign on the dump shack read: "Do not remove binders until lines are tightened." The plaintiff, working on the east side of the truck, went to the rear of the latter and there removed one of the four binder chains. Removal is effected by unhooking the chains and then throwing the shorter end over the logs, whereupon the driver pulls the chain from under the load.

The plaintiff usually removed the four binder chains, released the bunk blocks, stepped to the front of the truck and then gave Harper a signal, whereupon the latter started his motor. The operation of the motor drew the straps taut to such an extent that the logs were lifted and rolled into the pond. That having been done, Harper pulled the straps down and returned them to their place in front of the brow log. Finally, by use of a block which was attached to the A frame, Harper lifted the trailer from the ground and thereupon the plaintiff backed his truck into position so that the trailer could be lowered upon it. All was then in readiness for the plaintiff to make the return trip to the scene of Rackley's logging operations.

Upon the occasion in question, while the plaintiff was removing the second binder chain, a short log,

which was not in the grip of the straps, fell to the east side of the truck and struck him. Evidence, which the jury had a right to believe, showed that the truck tilted to the east, that is, toward the plaintiff, as much as 16 to 18 inches due to quantities of bark which lay in the road adjacent to the brow log. The deposit of bark tilted the truck away from the pond and toward the place where the plaintiff performed his duties.

The situation disclosed by the above-reviewed evidence presents the questions as to whether (1) the defendant "had joint supervision and control with the employer (Rackley) of the injured workman" over the log dump area, and (2) whether those two employers were "engaged in the furtherance of a common enterprise or the accomplishment of the same or related purposes" at that place, as the quoted words occur in ORS 656.154, supra.

The same questions were before this court in *Inwall v. Transpacific Lumber Co.*, 165 Or 560, 108 P2d, 522; *Brown v. Underwood Lumber Co.*, 172 Or 261, 141 P24 527; *Atkinson v. Fairview Dairy Farms*, 190 Or 1, 222 P2d 732; *Johnson v. Timber Structures, Inc.*, 203 Or 670, 281 P2d 723. The questions were discussed by the court in *Plummer v. Donald M. Drake Co.*, 212 Or 430, 320 P2d 245. Cases dealing with related questions are *Kosmecki v. Portland Stevedoring Co.*, 190 Or 85, 223 P2d 1035, and *Hensler v. City of Portland*, 212 Or 28, 318 P2d 313.

The Inwall case concerned three corporations of which the stockholders were the same persons and the officers were, in effect, the same. Each of the corporations performed a component part of a single large enterprise. One of the three, Transpacific Lumber Company, manufactured lumber and, by means of motor carriers operated by its employees, delivered

the lumber to a dock three fourths of a mile distant from the sawmill. The dock was owned by the second of the three corporations, the Transpacific Terminal Corporation, and was used by a vessel, the Port Orford, which was owned by the third of the three corporations, the Gorman Steamship Company. Virtually no other use was made of the dock. The Port Orford was a lumber-carrying vessel which transported to market the product of the Transpacific Lumber Company. Thus, as the decision indicated, the activities of the three corporations were component parts of a single integrated enterprise. The motor carriers conveyed the lumber to the dock and stevedores in the employ of the Gorman Steamship Company hoisted it into the vessel. The plaintiff in that case was a stevedore in the employ of the Gorman Steamship Company, who was injured while upon the dock by one of the motor carriers which employees of the lumber company operated. The evidence indicated that, in order to facilitate loading, the carriers brought their loads of lumber to the edge of the dock at the point which was immediately adjacent to the hatch where loading operations were under way. Since that was the place where the stevedores were working, the latter stepped aside upon approach of a carrier to make way for it. After the carrier had deposited its load and had backed away, the stevedores placed slings around the lumber, then attached the slings to the vessel's tackle and thereupon the gears hoisted the lumber aboard the vessel. The operation brought the two crews together. The carrier crew was supervised by a foreman and the stevedores by the captain of the Port Orford. The decision found that there was joint supervision and control over the place of the injury, together with furtherance of a common enterprise.

In *Brown v. Underwood Lumber Co.*, supra, the plaintiff was employed by the Warner Mountains Lumber Company as a scaler. The Warner Company owned a tract of timber, half of which it sold to the defendant. The latter was granted a license to come upon the land, cut and remove the timber. The plaintiff was injured while scaling logs that were within the contract. His employer, the Warner Company, also employed a man whom the court found "had supervision over the cutting operation covered by the above-mentioned contract." The duties of that individual as described by him were

> " 'to see that they did not cut their stumps not any excessive height; that they utilized the tops of the trees * * *; that they did not do excessive breakage; that they did not leave trees which the contract called for them cutting.' It was also his duty to run the lines to determine where the cutting operations were located and to supervise burning of brush and the removal of dangerous snags along the roadway."

The decision found that the Warner Company "had joint supervision and control over the premises in question and was engaged in the common enterprise of logging."

In the Atkinson case, the plaintiff, a driver for the Dairy Co-operative Association, delivered milk to the defendant's plant (Fairview Dairy Farms). When he arrived at the plant he removed the cans from the truck and assisted in weighing the milk by assembling the cans in such order that all of one farmer's milk was weighed as a unit. He also checked the weights to see that each farmer received his correct credit. When the cans were returned, he inspected them to determine whether they had been cleaned properly.

The plaintiff maintained that the Inwall case was distinguishable on the ground that in that case the two crews were each under separate supervisory employees. The decision (Atkinson) said:

"* * * As to the supervisory employees, it is true that the carrier crew had a foreman, and the stevedores were under the supervision of the captain of the ship; however, in principle it would make no difference whether the premises were controlled by supervisory employees or by the employees themselves. In either instance, the employees represented the employer, and the control in each instance would depend on the nature of the work involved rather than on who in particular was directing the same."

The court found joint supervision and control, together with the conduct of a common enterprise.

In *Johnson v. Timber Structures, Inc.*, supra, the defendant had contracted to sell and deliver sawdust to the plant of the Volney Felt Mills. The plaintiff, an employee of the Volney Company, was injured on the Volney Company premises when he was struck by a truck driven by an employee of the defendant which was engaged in delivering sawdust. Ordinarily, the plaintiff would have inspected, and accepted or rejected the sawdust. If accepted, the plaintiff would have given the driver a receipt and directed him to dump the sawdust at a place selected by the plaintiff. In reversing the judgment which the circuit court entered for the defendant, this court said:

"The act itself does not define joint supervision and control. These words are not of precise import although Webster defines 'supervision' as the 'Act or occupation of supervising; inspection; oversight.' And in Fluet v. McCabe, 299 Mass 173, 12 NE2d 89, 93, we read that 'the words "supervision and control" comprehend an exercise of restraint or

direction, of authority over, of domination and command.' * * *

"In the instant case * * *. Defendant in no wise exercised any restraint, direction, authority, domination or command over the premises in question. The only control and supervision on the part of the truck driver was that of the truck itself. The fact that the truck occupied the premises is no evidence that the driver exercised control and supervision over the same."

The court found that joint supervision and control were absent.

In the above-reviewed cases, whether the supervision was exercised by a supervisory employee or by the workman himself, the nature of the work was such that it required supervisory attention. In each case in which the court found joint supervision and control, the party whose supervision and control were held established performed, through an employee at the place where the injury occurred, acts which were found to have been the exercise of the supervisory function. In the single case which did not find joint supervision and control, acts of the kind just described were absent.

We think that this case bears a marked similarity to *Inwall v. Transpacific Lumber Co.,* supra. In that case, the fact that the stockholders and officers of the three corporations were virtually the same persons made it easy for the three to engage in their common enterprise and, in so doing, to exercise joint supervision and control. In order to reach that point of view, it was not necessary to lift the corporate veil or disregard the corporate entity theory.

In the case now at bar, the two employers had entered into a contract governing the logging of the aforementioned O. & C. tract and the delivery of the logs into the defendant's pond. The contract provided

that each would receive one half of the profits earned by the venture. Each contributed to the venture something of substance: (a) the defendant ventured some of its capital, and (b) Rackley contributed his brawn and logging equipment. The agreement was well designed to promote accord and mutuality of efforts upon the part of the two employers as they discharged their respective convenants. Co-operation, whether purely voluntary or induced by hopes of joint profits, normally is an effective means of furthering a common enterprise or related purposes.

The agreement before us required Rackley to "deliver all of said timber to the pond". Undoubtedly, the words "to the pond" meant into the pond. When the plaintiff approached the scaler's shack, a series of duties awaited him. They could be performed effectively only in the event the two employers, through their employees, exercised joint control and deemed themselves engaged in a common enterprise. We believe that such was the fact.

It is our belief that the second and third assignments of error disclose error. They are sustained.

Reversed.