Argued March 17, affirmed June 8, 1960

# NELSON ET AL *v.* BARTLEY ET AL

352 P. 2d 1083

*Robert E. Jones,* Portland, argued the cause for

appellants. With him on the brief were Engelgau & Jones, Coos Bay.

*Winfrid K. Liepe,* Portland, argued the cause for the respondents. With him on the brief were Howard K. Beebe and Maguire, Shields, Morrison, Bailey & Kester, Portland, and McKeown, Newhouse & Johansen, Coos Bay.

Before McAllister, Chief Justice, and Rossman, Perry and Duncan, Justices.

ROSSMAN, J.

This is an appeal by the plaintiffs who are the widow and five minor children of one Joseph J. Nelson, deceased, from a judgment of the circuit court which dismissed their complaint. The judgment was entered after trial and upon findings of fact. The five minor children appear through their guardian ad litem, the widow. The defendants, who are three in number, constitute a partnership entitled B. P. & S. Logging Company.

The complaint charged the defendants with negligence and averred that the latter caused the death of the aforementioned Joseph J. Nelson. Nelson was not an employee of the partnership. He was employed by a corporation entitled Menasha Plywood Corporation which operated a log dump known as the Menasha log dump. The partnership was engaged under a contract with Menasha in producing logs from timber land owned by Menasha and in delivering the logs to the Menasha log dump. Joseph J. Nelson, as an employee of the Menasha Plywood Corporation, had charge of the log dump. May 7, 1957, one of the defendants' employees, Ernest Shanahan, drove one of

their log trucks loaded with logs to the log dump and, while Shanahan and Nelson were performing some work preparatory to the dumping of the logs into the water, one of the logs fell from the truck and caused Nelson's death. This action was instituted against the defendants under the Employer's Liability Act to recover damages. At the beginning of the trial plaintiffs' counsel dictated into the record a stipulation that the defendants and the Menasha Plywood Corporation were employers who were subject to and had accepted the Workmen's Compensation Law of this state.

The answer of the defendants averred that at the time of the fatal injuries the defendants were on premises over which they and the deceased's employer (Menasha Plywood Corporation) had joint supervision and control. It also averred that at that time the defendants and Nelson's employer were engaged upon those premises in the furtherance of a common enterprise and the accomplishment of the same or related purposes. In the stipulation which plaintiffs' counsel dictated into the record at the beginning of the trial it was agreed that:

"* * * the accident causing said injuries and death arose out of and occurred in the course and scope of his said employment. As a result of said injuries and death of Joseph J. Nelson, plaintiff Helen Nelson applied for and received benefits of the Oregon Workmen's Compensation Law of the State of Oregon, and plaintiff Helen Nelson has filed her election to seek remedy against third parties."

After the plaintiffs and the defendants had presented all of their evidence the judgment challenged by this appeal was entered.

ORS 656.152 provides:

"(1) Every workman subject to ORS 656.002 to 656.590 while employed by an employer subject to ORS 656.002 to 656.590 who, while so employed, sustains an accidental injury, or accidental injury to prosthetic appliances arising out of and in the course of his employment and resulting in his disability, or the beneficiaries of such workman, if the injury results in death, are entitled to receive from the Industrial Accident Fund the sums specified in ORS 656.002 to 656.590. * * *

"(2) The right to receive such sums is in lieu of all claims against his employer on account of such injury or death * * *."

ORS 656.154 is the section of our laws which governs the issues submitted by this case. At the times material to this case it read:

"(1) If the injury to a workman is due to the negligence or wrong of a third person not in the same employ, the injured workman, or if death results from the injury, his widow, children or other dependents, as the case may be, may elect to seek a remedy against such third person. However, no action shall be brought against any such third person if he or his workman causing the injury was, at the time of the injury, on premises over which he had joint supervision and control with the employer of the injured workman and was an employer subject to ORS 656.002 to 656.590.

"(2) As used in this section, 'premises' means the place where the employer, or his workman causing the injury, and the employer of the injured workman, are engaged in the furtherance of a common enterprise or the accomplishment of the same or related purposes in operation."

One of the findings states:

"* * * At the time and place of said fatal injury to the said Joseph J. Nelson, defendants and

their employees were on premises over which they had joint supervision and control with Menasha Plywood Corporation, the employer of the plaintiffs' decedent, Joseph J. Nelson, and at said time and place, defendants and the employer of said Joseph J. Nelson, were engaged upon said premises in the furtherance of a common enterprise and the accomplishment of the same or related purposes in the operation."

The plaintiffs-appellants submit two assignments of error:

1. "The Court erred in finding that at the time and place of the fatal injury to Joseph J. Nelson that Defendants and their employees were on premises over which they had joint supervision and control with Menasha Plywood Corporation, the employer of the Plaintiffs' decedent, Joseph J. Nelson."

2. "That the Court erred in finding that at the time and place of the fatal injuries to the decedent, Joseph J. Nelson, Defendants and the employer of the said Joseph J. Nelson were engaged upon said premises in the furtherance of a common enterprise and the accomplishment of the same or related purposes in operation."

A witness for the defendants, Clifton N. Parrish, who had driven log trucks for many years and who was familiar with the method employed at the Menasha log dump in the unloading of log trucks, gave a detailed description of the method. He also described the manner in which the unloaded log truck was prepared for the return trip to the woods. Parrish's description of those methods is not criticized by the plaintiffs. We will shortly quote it but before doing so we take note of the fact that one of the plaintiffs' witnesses, Arthur Ellsworth Jones, in response to a question propounded to him by plaintiffs' counsel,

stated that the description of the manner in which the Menasha log dump was operated, as given by the defendants' witnesses, including Parrish, was correct. We take the following from Jones' testimony:

"Q. In hauling into the dump, the Menasha Log Dump, when Mr. Nelson was present, what was the procedure that you followed, was it similar to the procedure that has been described by the other witnesses?

"A. Yes."

The evidence indicates without contradiction or challenge that the Menasha log dump was operated in the same manner as all others. Due to Jones' testimony and the fact that the plaintiffs' witnesses did not take to task any part of the testimony of Parrish and of the other witnesses who gave similar testimony we believe that we can depend upon Parrish's description of the manner in which the Menasha log dump was operated as accurate. The following is Parrish's description:

"Q. Now, will you state for the record, and to the Court, what procedure was followed when Mr. Nelson was present there at the log dump?
"A. He would spot the truck, as it came in.

"Q. By that you mean what?
"A. He would stop us when the load was centered under the dumping machine.

"Q. All right—
"A. And I would get out and he would generally put the straps under the load.

"Q. The straps under the load, what do you mean by that?
"A. Well, the dump straps, he would put them under the load, and hook them to the dump machine, and I would start taking off—well, I would go back and get my flag, and start taking off the wrappers.

You know, you have your red flag on the rear of the load, for a warning.

"Q. At the end of the long logs?

"A. Yes.

"Q. What did you do after that?

"A. Well, take the wrappers off.

"Q. How many wrappers would you generally have on your load, Mr. Parrish?

"A. The law required four.

"Q. And is that what would generally be on the load?

"A. Yes.

"Q. Would you have more on some loads?

"A. Yes, you would have a gut wrapper on some of them.

"Q. How were the binders loosened and the wrappers removed?

"A. You would loosen the binders and take the wrappers off.

"Q. Who would do that?

"A. I would do part, and Mr. Nelson would do part.

"Q. Did Mr. Nelson ever instruct you to remove the wrappers or not to remove them?

"A. No.

"Q. Was that just a generally understood procedure between you?

"A. Yes—

"Q. Is that correct?

"A. Yes.

"Q. Did the fact that you worked together on doing these jobs, did that speed up the dumping operation?

"A. Yes.

"Q. If only person—if only one person did it, what would have been the result?

"A. There would have been a hangup.

"Q. Will you state for the record and for the Court what occurred, who did what, after the wrappers were removed, who did what?

"A. Well—

"Q. After the wrappers were removed?

"A. I would knock the front bunk block out and Mr. Nelson would knock the back one loose, at times.

"Q. And, for the record, what would be the result if those bunk blocks were not knocked loose?

"A. It would be hard to unload the load, because those blocks went out and over against the brow log and gave the logs a chance to slip.

"Q. It would have been difficult to spill them, otherwise, is that correct?

"A. Yes.

"Q. What was done next?

"A. Well, the straps were let back down after the load was dumped and Mr. Nelson would unhook the straps and place them back on the brow log, and I would set up the block, the bunk block, and I would pull the trailer ahead and he would spot the trailer under the hook. He would just holler when to stop.

"Q. He would give you a signal?

"A. Yes.

"Q. Was that a cooperative effort which was necessary to center the trailer under the hook?

"A. Yes.

"Q. What would occur after the unloaded trailer was centered under the hook?

"A. I would get out and take the air lines loose, and unhook the reach from the back of the truck.

"Q. Then did you do anything further?

"A. I got back in the truck and he lifted the trailer up in the air.

"Q. How did he get the hook in the trailer so it could be lifted onto the truck?

"A. There was a strap there and—

"Q. Who put the hook into the trailer strap?

"A. Most of the time it was the truck driver.

"Q. Then what happened after the trailer was hoisted into the air?

"A. The truck was backed in under it.

"Q. Who did that?

"A. The driver.

"Q. The person in your position?

"A. Yes.

"Q. Is that the routine that you followed personally?

"A. Yes.

"Q. Then what occurred?

"A. When I had backed up far enough, he would holler, and I would stop and he would let the trailer down on the truck.

"Q. And then—

"A. The driver would then get out and climb up on the trailer and unhook the dump hook from the trailer strap.

"Q. Once that was done, would the dump man lift it up in the air, then?

"A. He would leave it there until the truck was pulled out from the landing.

"Q. Who would drive the truck away from the landing?

"A. The truck driver.

"Q. Did you ever receive from Mr. Nelson any orders or instructions to do or not to do any particular thing on the dump?

"A. No.

"Q. If any problem arose at the dump, with respect to unloading, how would they be resolved between you and Mr. Nelson?

"A. We would talk it over and figure the best way to do it, is what we would do.

"Q. Would that be done jointly?

"A. Yes.

"Q. Did Mr. Nelson ever refuse to unload one of your loads?

"A. No.

"Q. He never did?

"A. No."

Parrish also testified that at times when he brought a load of logs to the dump Nelson was not present and that thereupon he dumped the logs himself. Other drivers gave similar testimony. We take the following from Parrish's testimony:

"Q. Can you state for the record whether there were any occasions while you were driving in to that dump for B. P. & S. Logging Company, when you were required to dump your own log loads?

"A. There was a couple of times that I dumped my own loads, yes.

"Q. And that would have been when?

"A. In 1956.

"Q. Can you state for the record, and to the Court, the reason that you dumped your own loads on those occasions?

"A. Well, Nelson would be in eating.

"Q. Will you explain that more fully?

"A. He was in eating his lunch.

"Q. Where was he?

"A. Oh, he was over at his house.

"Q. He had his house near the dump?

"A. Yes.

"Q. Was he aware at these times that you were dumping your own load?

"A. I imagine he was.

"Q. Did he ask you to stop running the equipment, or anything, at those times?

"A. No.

"Q. On those occasions how did you get your load spotted?

"A. Well, I hauled in there enough so that I knew about where the load was to be spotted.

"Q. Were any other B. P. & S. Logging Company drivers there with you?

"A. Yes.

"Q. Who was that?

"A. Well, Bill Summerlin was.

"Q. Bill Summerlin?

"A. Yes.

"Q. Who is Bill Summerlin?

"A. A driver for B. P. & S.

"Q. On that occasion what occurred?

"A. I pulled in, spotted my load, put the straps on, tightened them up, released the binders, took the wrappers off, knocked the blocks out, and dumped the load."

The foregoing will suffice as a delineation of the facts.

Cases similar to this one have been before this court upon several occasions in the past. Each has presented as its principal issue: Did the two employers exercise joint supervision and control over the fateful premises and were they engaged there in the furtherance of a common enterprise or related purposes. No two of the cases have been exactly alike, and in the process of reaching decisions this court resorted in part to a comparison of the facts of the case awaiting decision with those of its precedents. In instances in which the defendant is seemingly financially responsible and evidence of his negligence appears to be available it may be tempting to permit the workman to maintain the action, but the section of our laws which we have quoted declares "no action shall be brought"

if the defendant and the workman's employer exercised joint supervision and control over the premises or were engaged there in the furtherance of a common enterprise or related purposes.

At the close of the evidence in the case at bar the able circuit court judge, Honorable Dal M. King, rendered his decision orally. The facts were then fresh in his mind. Judge King has served as a pro tempore justice of this court. We believe that his decision constitutes a good analysis of the evidence and constitutes a correct application of ORS 656.154 to the facts. The following is Judge King's decision (we have added citations to the reports): ·

"* * * the Court has definitely made up its mind on the question, and I might say that I haven't done it simply by sitting here today and listening to this, because I probably have had half a dozen of these cases within the past two or three years, very similar type, and for them and for this case I have checked all the available law on the matter, and it is just a question of applying the facts here to the law, as I see it, and I feel that I could do that just as well now as I could tomorrow or next week. I might not say it in just as smooth a manner now as if I would sit down and take a lot of time writing it out, but I think I can go through the general principles.

"This type of case has been up before our Supreme Court five or six times now, the Brown v. Underwood case, 172 Or 261, 141 P2d 527; Inwall v. Transpacific Lumber Company, 165 Or 560, 108 P2d 522; Atchison v. Fairview Dairy Farms, 190 Or 1, 222 P2d 732, and another one came in there that didn't set out the law too strongly. The Johnson v. Timber Structures case, 203 Or 670, 281 P2d 723, especially in the concurring opinion, goes into quite some detail on it, and then the most recent case is the case of Hensler v. City of Portland, 212 Or 28, 318 P2d 313.

"I think the Johnson v. Timber Structures concurring opinion sets out generally what must be shown: First, that the negligent third person must have been an employer subject to the provisions of the Workmens Compensation Act; Second, that he or his workmen causing the injury must have had joint supervision and control with the injured workman's employer over the premises where the injury occurred; and, Third, that he and the injured workman's employer must have been engaged in the furtherance of a common enterprise or in the accomplishment of the same or related purposes in operation. That is later explained to a certain extent by Justice Lusk in Hensler v. City of Portland in which he says 'We think that the Inwall case establishes the correct construction of the statute. It was there said that it need not appear that the workmen formally entered into an agreement to become engaged in the furtherance of a common enterprise. "All that is essential is that they occupy the same premises and perform component parts of a general undertaking." '

"And then it goes on to say that the specially concurring opinion in the Johnson case was not intended to announce a different rule.

"Here we have both employers carrying compensation, under the Industrial Accident Commission, the defendant company was carrying compensation on his workmen, and then we come to the next question, of the joint supervision and control.

"That is the question that causes the most of the trouble. I am of the opinion that in this case there was very definitely joint supervision and control of the premises. By that I mean simply this, that the testimony clearly shows to me that all parties connected with the operation took part in carrying out the operation. There were special duties, yes, that certain ones usually did, but I am mindful of the testimony that there was no absolute distinguishing of duties, the truck driver helped to unfasten the straps, he helped to release

the bunks, he helped at various aspects of the work, and in one instance the driver even testified that he operated the machine while the other man was there, a time or two. Generally, I think it was a joint operation.

"Now, as to control of the premises, I don't conceive that control means that both parties have to own them and have exactly the same amount of control, it is a question of whether they worked together in the furtherance of a common enterprise, and there is no question here, even the safety requirements as put forth by the defendants, and by their witness, shows that two men are required there to do that work, and the Menasha people only furnished one man, the second man had to be the truck drivers, in order to comply with the requirements of the law, and if the second man had to be the truck driver, then naturally he had to take part in the work and, while he might not have been the principal supervisor, he had some control over it, at least he had the control of his own machine.

"It might be said that this goes against the theory as brought out in the Johnson v. Timber Structures case, but that was simply a case of selling sawdust and the truck backing up to the factory and the only thing that the truck driver did there was to operate the hoist and dump the sawdust. He and the representative of the roofing company had nothing or practically nothing in common to do, there wasn't anything in that case at all about them taking a part in doing certain parts of the unloading operation. It was a simple case of simply selling sawdust.

"Here you have a case where the Menasha people owned this timber, in the first instance. They employed these loggers or contracted with them to bring in the timber, and the representative of Menasha himself testified that very often the scale wasn't made until the logs were in the water. I find nothing in the contract that says they are

required to put the logs in the water, but I assume, and I take it from the testimony, that by their practice they were at least to help put the logs in the water, and in that helping they were assuming joint supervision and control and taking part in the operation, and, consequently, I am perfectly satisfied.

"Now, you have a different situation here also as to the questioned premises. In the Timber Structures case, as I said before, the truck was backed right up to the plant. Here you have a little dumping outfit off some distance from the mill, and certainly these loggers probably have no control over the mill or the plywood plant, but the premises where the dumping was done they did have some control over that, and exercised some control, and it is frankly admitted here by the manager of the Menasha Company that that was the understanding, and intendment, and I think all the witnesses have testified that they all helped and took part, and naturally they would all have to assume some responsibility and naturally would have to assume some of the danger.

"Then, on the third point, as to whether they were engaged in the furtherance of a common enterprise or the accomplishment of a related purpose, there again I think that that enterprise does not necessarily refer strictly to the making of plywood. The enterprise here could be brought down to a narrower basis, that of dumping these logs in the bay, that is what they were actually engaged in here. It did have a connection with the plywood operation because they were bringing the logs in to be made into plywood, but the exact operation here was dumping the logs into the bay.

"I am satisfied that this case complies with all the requirements set out by the statute and as set out by the cases that have been decided in Oregon, and I am satisfied that on the basis of the evidence that has been submitted here that the Supplemental

Answer should be sustained and that the Complaint should be dismissed.

"In doing this I want it definitely understood that I have all the feeling in the world for anybody that is hurt or killed, but the law was made for the Accident Commission, to which all parties here were paying, for them to take charge in cases of this kind, and it was also made as a protection for the employers, to a certain extent—of course principally or primarily of the employee.

"I am definitely of the opinion that it is the type of case that was intended to come under the law, and I think that is abundantly clear from the evidence here.

"I did not expect you to close so soon, I am giving this kind of impromptu, but I am thoroughly convinced that all matters have been proven here under the supplemental answer necessary to bring the case under the provisions of that statute—and you may draw up findings and order in that regard."

Since Judge King expressed himself as above this court rendered two more decisions upon the subject matter of ORS 656.154: *McGuire v. Brown,* 217 Or 300, 342 P2d 774, and *Claussen v. Ireland,* 216 Or 289, 338 P2d 676. Judge King's decision is in accord with both of those cases.

We believe that the Finding of Fact quoted in a preceding paragraph is well justified by the evidence. It leaves no room for any conclusion except one in accord with that challenged by the appeal.

In our belief Judge King's decision correctly determined the facts and faithfully applied to them the demands of ORS 656.154. We adopt his decision as our own.

The above being our conclusion, it follows that the two assignments of error are dismissed and that the challenged judgment is affirmed.