Pecor, by Guardian *ad litem,* and another, Respondents, vs. Home Indemnity Company of New York, imp., Appellant.

*March 14—April 9, 1940.*

408

For the appellant there was a brief by *Burns, Mehigan & Schoen* of Milwaukee, and *Bird, Smith, Okoneski & Puchner of Wausau,* and oral orgument by *Irving P. Mehigan.*

For the respondents there was a brief by *O'Melia & Kaye* of Rhinelander, and oral argument by *A. J. O'Melia.*

MARTIN, J. Appellant contends, (1) that Wilbur Pecor assumed the risk of injuries and that the court erred in not so finding as a matter of law; (2) that material errors on the trial and prejudicial, improper conduct of plaintiffs' counsel resulted in a perverse and excessive verdict; and (3) that the court erred in not granting a new trial.

Bearing upon Jackson's negligence in operating the automobile at the time in question and upon Wilbur Pecor's assumption of risk, it appears that on the evening of December 10, 1937, Wilbur Pecor, age eighteen, Malcolm Powell, age fifteen, and John Powell, age seventeen, rode with George Jackson, age sixteen, in George Jackson's father's car to Eagle River to witness a basketball game. Following the game, they attended a dance where the boys met two girls whose homes were at Boulder Junction. During the dance, Wilbur Pecor agreed to take the girls to their homes which were about twenty-five miles beyond where the boys lived. The party left Eagle River at about 12:30 a. m. in Jackson's car, Pecor having given Jackson a dollar to buy gas. John Powell drove the car from Eagle River to Boulder Junction at a speed of from thirty to thirty-five miles per hour. Jackson dozed or slept on the way. Malcolm Powell got out of the car at his home. It was snowing and there was ice and snow on the sides of the road. After leaving the girls at their homes, the boys (Wilbur Pecor, John Powell, and George Jackson) started on the return trip to their homes, Jackson driving the car, Powell seated next to him, and Pecor on the right-hand side in the front seat.

From Boulder Junction to the place where the accident occurred was between six to eight miles. There were a number of curves and hills in the highway. The testimony indicates that Jackson drove at a speed of from forty-five to fifty miles per hour, and as he rounded the first curve the car skidded. Pecor testified that he then warned Jackson that he was driving too fast (Powell and Jackson both testified that they did not hear Pecor's warning). Pecor gave no further warning to Jackson, and there is some testimony that Pecor dozed or slept until the car had about reached the scene of the accident. There was no ice in the center of the road. Between the snowbanks on the sides there was

about twenty feet of open highway for travel. Visibility was good. The car was a 1937 Plymouth, equipped with good four-wheel brakes which applied evenly, good tires, and operated smoothly.

From the first curve to the scene of the accident was between five and six miles. Pecor testified that after his pro test Jackson slowed down in passing some of the succeeding curves. From the time the car skidded on the first curve out of Boulder Junction to the scene of the accident, John Powell was sleeping. Beyond the place where the accident occurred, there is a sharp turn in the road, then a steep decline for a distance of about eight hundred feet, and at the foot of the hill there is a long curve. Jackson testified he did not see this curve at the bottom of the hill until he was about three hundred feet away. He testified he then let up on the gas, and because of the speed at which he was driving, he cut to the inside of the curve in order to make it. In so doing, when the wheels hit the snow and ice on the inside of the curve, the car skidded. He then applied his brakes and the car skidded or slued for a distance of seventy to one hundred fifty feet over to the other side of the road and into a guardrail, which rail went through the right side of the car striking Pecor and breaking both of his legs.

Pecor testified that he did not call Jackson's attention to the curve at the bottom of the hill because he thought Jackson could see it. He further testified that he realized Jackson was going too fast down the hill, but did not make any further protest because he thought any statement he might then make would only excite Jackson.

Appellant makes no contention that the evidence does not sustain the jury's finding of negligence on the part of defendant Jackson. On the contrary, appellant contends that Jackson's negligence was so open and apparent that the trial court should have held, as a matter of law, that Pecor as-

sumed the risk of injury. The jury found Jackson negligent as to speed, lookout and control, and in respect to operating the car on the inside of the curve where the roadway, because of ice and snow, was slippery. The main-traveled part of the road was covered with black-top. The testimony is to the effect that the snow flurries were light and dry and did not obstruct the visibility of the black-top surface. Pecor had no reason to believe that Jackson would drive on the inside of the curve where there was an accumulation of snow and ice instead of keeping upon the main-traveled portion of the highway, which, according to all of the evidence, was free from any accumulation of snow or ice.

We think it apparent that speed alone did not produce the accident. Driving to the inside of the curve upon a slippery surface and the sudden application of brakes would, as a matter of common knowledge, cause this car to skid in the manner disclosed by the testimony, and cause the consequent loss of control by the driver. Any protest by Pecor after Jackson had started to cut the curve would have been of no avail.

" ' . . . There can be no doubt of the rule that the guest must take the host, with his defects of skill and judgment, and his known habits and eccentricities of driving, and in addition that the guest will be considered to acquiesce in any course of driving *that has persisted long enough to give him an opportunity to protest and thus indicate dissent or disapproval of the manner of driving.*' " *Groh v. W. O. Krahn, Inc.,* 223 Wis. 662, 667, 271 N. W. 374.

In finding Jackson negligent as to lookout and control, the jury must have concluded that had Jackson maintained a proper lookout, he could have kept his car upon that part of the roadway which was clear of ice. This court has held that lookout may be a momentary matter as to which there can be no assumption of risk by the guest. *Poneitowcki v. Harres,* 200 Wis. 504, 228 N. W. 126; *Maltby v. Thiel,* 224 Wis. 648, 653, 272 N. W. 848.

Jackson's act in suddenly driving upon the icy portion of the highway and then applying the brakes when his car commenced to skid was obviously such a momentary act that there was no time or opportunity for Pecor to protest or leave the car to avoid injuries. See *Forbes v. Forbes,* 226 Wis. 477, 480, 277 N. W. 112; *Webster v. Krembs,* 230 Wis. 252, 259, 282 N. W. 564.

In *Rudolph v. Ketter,* 233 Wis. 329, 289 N. W. 674, the guests recovered for injuries sustained because of the negligence of the host, who, while driving upon the left side of the road, suddenly turned to get upon his right side and went into the ditch causing their injuries.

We are of the opinion that the evidence sustains the conclusion that the accident happened, not because of lack of skill, experience, or judgment on the part of the defendant Jackson, but by reason of his failure conscientiously to exercise such skill, judgment, and experience as he had. See *Monsos v. Euler,* 216 Wis. 133, 138, 256 N. W. 630.

"The plaintiff having once protested against the rate of speed at which the defendant Saecker was driving, the defendant having slowed down to a rate of speed of thirty-five miles an hour, which he maintained until his attempt to pass the Schmirler car—a matter of seconds as will be shown later—and there being no time nor opportunity to protest against his attempt to pass the Schmirler car, it cannot be held as a matter of law that the plaintiff acquiesced in the reckless driving of the defendant." *Royer v. Saecker,* 204 Wis. 265, 268, 234 N. W. 742.

What is said in the latter case is applicable here. Pecor had once protested as to the speed in passing a curve. The evidence warrants the conclusion that thereafter Jackson reduced the speed, and there is no evidence of reckless driving until momentarily before the accident occurred. Had Jackson remained upon the traveled part of the highway, which was free from any accumulation of snow and ice, instead of cutting the curve, there would have been no occasion for

further protest by Pecor. We are of the view that the question as to plaintiff's assumption of risk was for the jury. See *Helgestad v. North,* 233 Wis. 349, 289 N. W. 822.

Appellant's second assignment of error is "that material errors on the trial and prejudicial, improper conduct of plaintiffs' counsel resulted in a perverse and excessive verdict." In considering this assignment of error, we will set out each alleged error in the order presented.

(1) Plaintiffs' counsel, in his opening argument to the jury, said:

"This is not a lawsuit involving Arthur Jackson or his son, George Jackson—it is a lawsuit between the Pecors, one the guardian and the other this boy, and the Home Indemnity Company.

"Mr. Smith [counsel for the insurance company] : If the court please, I object to the statement of counsel that this action does not involve the Jacksons, Arthur Jackson and George Jackson, but only involves the insurance company.

"Mr. O'Melia : The preliminary action is between Wilbur Pecor and Frank Pecor against the Home Indemnity Co.

"The Court: You may proceed with the argument."

(2) Plaintiffs' counsel also said:

"I presume he [counsel for the insurance company] will repeat the testimony to you of young Pecor at the time he was still under opiates and dope and drugs down there in the hospital, when this man from Ironwood [one of the attorneys for the insurance company] had no more business going to see him than would the devil in my estimation.

"Mr. Smith : If the court please, I want to object to the remark by counsel that Mr. Tretheway had no more business going to see this man at this time than the devil would have.

"Mr. O'Melia : That is my honest conviction.

"The Court: You may proceed."

(3) Plaintiffs' counsel, in his argument to the jury, said:

"Frank Pecor, too, you remember, said that he reluctantly consented to this examination in the hospital, a procedure

that I, in all of my experience, never saw or heard of before, I have never done it, and it may be the custom as he says that he—

"Mr. Smith: I object to any statement of counsel as to what his custom is, or what he has done, because that is not in the evidence. I ask the court to instruct the jury that that is not properly in evidence, and therefore is not proper here now.

"Mr. O'Melia: May I ask if you have ever heard of it before yesterday?

"The Court: You may continue, Mr. O'Melia."

(4) Plaintiffs' counsel further argued:

"You remember, down there, when Frank Pecor reluctantly said to Tretheway, 'Well, I don't think I want you to do this thing,' Tretheway said, 'It is just a formality. We are going to take care of all the damages and pay for them;' holding out a stick with honey on it to trap this boy.

"Mr. Smith: I object to the statement just made, and the statement that has been made several times, with reference to the insurance company.

"The Court: You may proceed."

(5) Plaintiffs' counsel further stated:

"I don't know as it is necessary to talk about this statement that Tretheway got. I haven't changed my opinion about that. I can't, for the life of me, understand why an insurance company, although they are making the greatest and most desperate attempts to avoid payment of any damages to this boy, I can't for the life of me understand why they couldn't send out their usual insurance agent instead of getting an experienced and very clever and well-read and learned lawyer, and then, after he comes down and gets these statements from these boys and sends them in to the company, why that company should send back and say, 'Well, that doesn't just do the trick. We want you to go back and get something more,' and do it in a certain way, and in a very clever way.

"Why can't all these men that are representing their company be honest and fair about this thing?

"Mr. Smith: If the court please, I object to the statement just made, and the statement that has been made several times, with reference to the insurance company.

"The Court: You may proceed."

(6) Again plaintiffs' counsel stated:

"Now I don't know why there is all of this talk about this statement in the hospital. We will submit to you, as it went into the evidence here, that Mr. Tretheway knew, as a lawyer, that the law says you can't do a thing of that kind within seventy-two hours. Why? There is a reason for that. You are not supposed to go to somebody who is in pain and suffering and under the influence of narcotics as this boy was down there in the hospital, because we all know that they don't know what they are talking about. But he waited only a few hours more and then went down there.

"And yet this man that they praise now to the sky, who started out there following in his footsteps to defeat this claim, if they can; this man said here the boy was alert. Is that honest? Is that fair?" (The statement to which reference was made above was taken ninety-six hours after the accident.)

(7) Plaintiffs' counsel further argued:

"And it would be a veritable miscarriage of justice, I submit to you, if in a case of this kind a boy can be reduced, as he has, in his earning capacity,—can suffer as he has, and then come into court and say, 'Oh you assumed the risk. You are out of court.'

"Mr. Smith: We object to that last statement, your honor, 'say to him that he is out of court.' There is nothing of that kind in this case.

"The Court: You may proceed."

(8) On the cross-examination of Mr. Tretheway, by plaintiffs' counsel, the following occurred:

"Q. You know that the law of Wisconsin says you are absolutely prohibited from doing that within seventy-two hours?

"Mr. Smith: Just a minute. If the court please, counsel is going into matters that have no bearing here and are

prejudicial. We ask that the court instruct the jury to disregard them.

"The Court: I will permit the answer to stand.

"*Q.* Yet you went into that hospital within ninety-six hours and spent an hour and a half getting this short statement from him; is that right? *A.* Talking to him, yes.

"*Q.* You were paid for your services solely by the insurance company? *A.* Yes, sir.

"*Q.* Arthur Jackson didn't employ you? *A.* No, sir.

"*Q.* Why did you tell Wilbur that you were representing the Jacksons then? *A.* I told him I was representing the Jacksons and the Home Indemnity Co., the insurance company of Mr. Jackson.

"*Q.* So you don't know what it feels like, four days after injuries like his, to be confined in bed as he was there at the hospital? *A.* No. I don't." (The foregoing questions were not objected to.)

The foregoing sets out practically all of the alleged prejudicial and improper statements and arguments of plaintiffs' counsel. In connection with number 1, it should be noted that the action originally begun was against the Home Indemnity Company as defendant. Thereafter, upon application of said defendant, George Jackson was interpleaded as a party defendant. Thereupon, pursuant to court order, plaintiffs prepared and served an amended summons and complaint in which Jackson was made a defendant. The prayer of the amended complaint was for judgment against the defendants. Jackson made no answer or otherwise appeared in the action. However, in this connection, it should be noted that the plaintiffs' action was grounded entirely upon the alleged negligence of Jackson, the driver of the car.

While plaintiffs had the right to proceed only against the Home Indemnity Company, after Jackson had been made a party, and although he was in default at the time of the trial, it was highly improper and prejudicial for plaintiffs' counsel to argue to the jury that "this is not a lawsuit involv-

ing Arthur Jackson or his son George Jackson—it is a lawsuit between the Pecors, one the guardian and the other this boy, and the Home Indemnity Co."

"We do not approve the practice of making the insinuation or exposing the fact that the defendant is insured, and counsel should not without good reason do either, and trial courts should discourage such practice by strongly denouncing it whenever it is indulged in without good reason and so handle the matter as to prevent as far as possible any possible resulting prejudice." *Walker v. Pomush,* 206 Wis. 45, 51, 238 N. W. 859.

Counsel's statement in this connection tended to eliminate defendant Jackson from liability for damages to plaintiffs and to emphasize that the insurance company alone would be liable for the damages assessed.

We do not deem it necessary to separately discuss the alleged prejudicial statements and arguments. We think it proper to say that in nearly every instance the prejudicial effect is emphasized by the court's failure to rule on the objections made by defendant's counsel. It will be noted that the only comment by the court was "You may proceed." We have seen that in hotly contested lawsuits, counsel may at times overstep the bounds of proper judicial procedure. When they do so, the duty of the court becomes more positive, because after all, the court is primarily responsible for the proper and orderly conduct of the trial. In *Markowitz v. Milwaukee E. R. & L. Co.* 230 Wis. 312, 321, 284 N. W. 31, the court said:

"Proper administration of justice requires that the court promptly check such improprieties on its own motion. A verdict returned upon a record free from such improprieties or after effective judicial control by prompt and positive rulings checking or counteracting them is not as apt to be impaired by reason of prejudice or passion on the part of the jury, and upon motions after a verdict its findings can be approved by the court with greater assurance and confidence as to the integrity and rectitude of the verdict."

In reference to number 7 above, the statement of counsel there referred to was made while referring to the third question in the special verdict which related to assumption of risk. We think it obvious that the effect of the argument was to convey to the jury the information that if that question was answered "Yes," plaintiffs would be out of court.

"It is reversible error for the trial court by instruction to the jury to inform the jury expressly or by necessary implication of the effect of an answer or answers to a question or questions of the special verdict upon the ultimate right of either party litigant to recover or upon the ultimate liability of either party litigant." *Banderob v. Wisconsin Cent. R. Co.* 133 Wis. 249, 287, 113 N. W. 738; *Beach v. Gehl,* 204 Wis. 367, 371, 235 N. W. 778; *Anderson v. Seelow,* 224 Wis. 230, 233, 271 N. W. 844.

There is an abundance of authority to the proposition that it is reversible error for either the court or counsel to inform the jury of the effect of their answer or answers upon the ultimate result of their verdict. If single instances of prejudicial statements and arguments be held reversible error, repeated instances multiply the gravity of the error.

In *Hanley v. Milwaukee E. R. & L. Co.* 220 Wis. 281, 263 N. W. 638, the court had occasion to consider whether prejudicial remarks of counsel in the examination of witnesses and in argument to the jury were reversible errors. What is there said is applicable here, particularly in view of the fact that the court in the instant case, upon objections of defendant's counsel, not only failed to rule upon the objections, but apparently expressed its approval by telling counsel for the plaintiffs "to proceed." In the *Hanley Case,* at page 287, the court said:

"The statements of counsel were passed over by the court's merely stating, on objection being made, 'sustained,' and on motion to instruct the jury to disregard the statement being made the court so instructed. But this mild treatment of the matter did not serve either to prevent recurrence of

the misconduct or to overcome its effect upon the jury. That it prejudiced the jury and influenced their verdict seems manifest from their excessive award of damages. The passion and prejudice that influenced the award of damages quite likely influenced the verdict on the other issues. We consider that we cannot properly pass the matter with mere criticism, as this court has often passed like matters in the past. The court should not only say something about it, but *should do something about it.* All that has heretofore been said in condemnation and admonition has had little, if any, effect toward stopping such misconduct. In the recent case of *Georgeson v. Nielsen,* 218 Wis. 180, 260 N. W. 461, we granted a new trial because of statements of counsel much less flagrantly prejudicial and harmful than those above stated. We consider that like action should be taken in the instant case."

Appellant contends that the verdict as to damages of $5,000 for personal injuries sustained by the plaintiff Wilbur Pecor and $2,000 for loss of earnings after the age of twenty-one are excessive. These damages are high. In our opinion they do reflect the repeated improper statements and arguments of plaintiffs' counsel to which reference has been made, and which were without admonition from the court that same should be disregarded. However, since we are of the opinion that the judgment must be reversed and a new trial ordered for the reasons hereinbefore stated, we deem it unnecessary to make further reference to the question of damages.

*By the Court.*—Judgment reversed, and record remanded with instructions that an order be entered granting a new trial upon all issues.