# CHARLES McCOURTIE v. UNITED STATES STEEL CORPORATION.

93 N. W. (2d) 552.

November 21, 1958—No. 37,418.

*Morgan, Raudenbush, Morgan, Oehler & Davis,* for appellant.

*Bonner, Bonner & Clements,* for respondent.

*Doherty, Rumble & Butler* and *Eugene M. Warlich,* for Minnesota Employers Association, Inc., and Associated General Contractors of Minnesota, amici curiae.

MURPHY, JUSTICE.

This is an appeal from a judgment entered in favor of plaintiff.

Plaintiff was working as an employee of a plumbing subcontractor when he was struck by a piece of steel dropped by defendant's employees, who were engaged in the steel structure work in a manner hereinafter described. The case was submitted to the jury on a special verdict, and the jury found that defendant was negligent; that such negligence was the proximate cause of plaintiff's injuries; that plaintiff was free from contributory negligence and did not assume the risk of the injuries which he sustained; that plaintiff's employer and defendant were not engaged on the same project; that plaintiff and the employees of defendant were not working together in the performance of such project; and that plaintiff and defendant's employees were not working together in the performance of such project in a manner which exposed them to the same or similar risks at the time of such injury.

The first question we have to consider is whether, as a matter of law, plaintiff's cause of action was barred by M. S. A. 176.061. For the purpose of determining that issue, the facts may be briefly summarized.

Reserve Mining Company was engaged in the construction of a taconite processing plant and related facilities at Silver Bay on Lake Superior. Hunkin, Arundel & Dixon Company was the general contractor on the job. A part of the plant consisted of a powerhouse. The

general contractor sublet the plumbing installation work on the power-house to Cherne-Sundland Company, plaintiff's employer. The general contractor sublet the steel construction work to the American Bridge Division of defendant, United States Steel Corporation. Both sub-contractors were either insured or self-insured under the Minnesota Workmen's Compensation Act.

Plaintiff suffered a severe injury to his leg on April 20, 1954, when a piece of steel fell from the superstructure which was being constructed by employees of defendant. Plaintiff had been working on the taconite plant construction from November 1953. At the time of the accident here involved, part of the steel superstructure had been erected. The record indicates that about 60 percent of the steel work had been completed. The columns and beams forming the skeleton of the superstructure were in place, connected with temporary fitting bolts and drift pins. Plaintiff was installing plumbing on the ground level. From 50 to 100 of defendant's workmen were working on various parts of the superstructure. Steel for use in this work was elevated to or near the place where it was needed, by a crane. At the time of the accident a crew of defendant's employees was installing girts on the outside walls of a part of the building. When the crane could reach the place where they were needed, the girts were raised singly and immediately connected to the columns and bolted in place. When the crane could not reach the place where the girts were needed because of the interference of beams, the girts were raised by the crane in bundles. They were pushed as far toward the place where they were to be used as possible by some of defendant's employees and then landed on steel beams. While a bundle of 12 pieces was being raised in that manner, it struck a part of the structure, causing 8 of the 12 pieces to slide out of the bundle and ricochet down through the steel skeleton of the building. When the pieces started to fall, an employee of defendant yelled "headache," an expression used in the industry to warn those below that something was falling. Plaintiff tried to get away but was struck on his leg by a piece of steel weighing over 175 pounds and was severely injured. Several of defendant's employees sought shelter under or near beams or wherever they could find protection from the falling steel.

■ The defendant contends that the plaintiff and the employees of

the defendant, who caused his injuries, were engaged in due course of business, in furtherance of a common enterprise, or project, in the accomplishment of the same or related purpose in operation on the premises where the injury occurred. It asks this court to interpret § 176.061, subds. 1 and 4, so as to hold that, where contractors and subcontractors or separate subcontractors are engaged in performing component parts of the same undertaking, they are engaged in the same project and that, if employees of such contractors and subcontractors are exposed to the same or similar hazards, the latter are within the protection afforded by § 176.061.

In considering the arguments of the defendant it is unnecessary to further discuss the history of § 176.061, as that subject is fully discussed in Tevoght v. Polson, 205 Minn. 252, 285 N. W. 893, and in Gleason v. Geary, 214 Minn. 499, 8 N. W. (2d) 808. In preface it should be observed that prior to the adoption of the Workmen's Compensation Act in 1913 an injured workman could recover only by bringing a common-law action in negligence.[1] However, with the adoption of the first workmen's compensation law in 1913,[2] a person injured in the course of his employment could proceed against his employer for the compensation provided for by the act or could sue the third-party tortfeasor in a common-law action for negligence.[3] If the injured person recovered in the common-law action for negligence against the third-party tortfeasor, the amount of the recovery could not be greater than the amount fixed by the compensation act. Thus, in effect, the injured person was limited to the amount he could recover under the compensation act, even though he was not barred from bringing an action for negligence.

The act was amended in 1923 by L. 1923, c. 279, § 1, to provide that the prohibition in respect to the right of injured workmen against a negligent third party applies "only where the employer liable for compensation * * * and the other party * * * legally liable for damages

---

[1]Tevoght v. Polson, 205 Minn. 252, 285 N. W. 893; Gleason v. Geary, 214 Minn. 499, 8 N. W. (2d) 808.

[2]See, L. 1913, c. 467, § 33.

[3]Hansen v. Northwestern Fuel Co. 144 Minn. 105, 174 N. W. 726; Uotila v. Oliver Iron Min. Co. 165 Minn. 475, 206 N. W. 937.

were engaged in the due course of business, (a) in furtherance of a common enterprise, or (b) the accomplishment of the same or related purposes in operation on the premises where the injury was received at the time thereof, and not otherwise." In discussing this amendment in the Gleason case, Mr. Justice Olson said (214 Minn. 507, 8 N. W. [2d] 812):

"* * * We think the obvious legislative purpose in adopting the amendment was to restore to the *injured person* an enlarged remedy against the negligent third party. * * * It is thus apparent that the blame is placed where it belongs, upon the party at fault, where of right it should be."

As a result of the 1923 amendment the injured employee was again permitted to maintain an action for common-law negligence in an unlimited amount except where prohibited by statute, and it is further clear, as Mr. Justice Olson indicated, that the legislature intended to enlarge both the rights and remedies of the injured workman and the liability of the third-party tortfeasor to the injured person.[4]

The statutory terms "common enterprise" and "the same or related purposes" are admittedly confusing when an attempt is made to apply them to a fact situation, and they have caused difficulty in attempts of this court to interpret them consistently. It should be acknowledged, however, that the intent of the legislature in certain respects is clear. It is certain that the legislature intended to restore, at least in part, the common-law rights of the workman injured by a negligent third party when both employers were under the act. In reviewing the authorities as they apply to various fact situations, one basic principle of law is clearly stated, and it is this: The protection of the statute is denied to the negligent third-party employer, *except in those situations where the employees are engaged in a common activity.*

In 1951 in Swanson v. J. L. Shiely Co. 234 Minn. 548, 558, 48 N. W. (2d) 848, 854, this court found the intent of the legislature to be as follows:

"* * * the legislature intended that an employe's common-law right

---

[4]See, Gleason v. Geary, *supra.*

of action be eliminated only where two or more employers subject to the act are engaged on the same project *and their employes are working together* in such fashion that they are exposed to the same or similar hazards created by such mutual engagements and are exposed to the same risks of injury." (Italics supplied.)

The above-quoted language clearly sets out the following three requisites for barring the injured workman's common-law action for negligence:

(1) The employers must be engaged on the same project;

(2) The employees must be *working together* (common activity); and

(3) In such fashion that they are subject to the same or similar hazards.

This interpretation of the statute emphasizes the *common activities of the employees* as opposed to the *common activities of the employers* and has been consistently followed by this court since Gentle v. Northern States Power Co. 213 Minn. 231, 6 N. W. (2d) 361. In a learned memorandum the trial court has pointed out that the prohibitive portions of the act apply only in cases where the different employees work together in a common activity on the premises on the same project and subject to the same risks of injury and has made the following pointed observation:

"This interpretation of the section, with emphasis on the common activities of the employees of the injured employee's employer and of the employees of the third party, rather than the activities of the employers, had been intimated in Tevoght v. Polson, 205 Minn. 252, 254, 285 N. W. 893 (1939), suggested in Gentle v. Northern States Power Co., 213 Minn. 231, 237-238, 6 N. W. 2d 361 (1942), adopted in Gleason v. Geary, 214 Minn. 499, 8 N. W. 2d 808 (1943), discussed in 27 Minn. L. Rev. 585 (1943), adhered to in Johnson v. City of Duluth, 216 Minn. 192, 12 N. W. 2d 192 (1943), and re-affirmed in Volding v. Harnish, 236 Minn. 71, 77-78, 51 N. W. 2d 658 (1952).

"Even prior to the Gleason Case there was a noticeable tendency to

restrict the scope of the application of the phrases 'common enterprise' and 'related purposes.' See 27 Minn. L. Rev. 585, 586-587 (1943)."

In Gentle v. Northern States Power Co. *supra,* an employee of a contractor was injured due to the defendant's negligence in failing to properly insulate a high-voltage wire which had been installed over the roof of the building. The defendant contended that it was engaged in a common enterprise with the plaintiff's employer and that therefore plaintiff was within the prohibitive portions of the statute. On the basis of the "delivery" cases[5] this court held that the statute did not apply, saying (213 Minn. 237, 6 N. W. [2d] 363):

"* * * Each was engaged in prosecuting its own business, in its own way and for its own purpose, independently of the other. They were not engaged in the accomplishment of the same or related purposes."

In a very lucid concurring opinion Mr. Justice Pirsig spells out the "common activities of the employees test" (213 Minn. 238, 6 N. W. [2d] 364):

"* * * The intent, purpose, and policy of the act thus manifested is served *only when the employes of different employers are engaged in a common activity.* * * *

"Misled by the confusing language used in the subdivision, we have not proceeded from this point of view. *We have examined not the common activities of the employes but rather the common purposes or enterprise of the employers.* * * *

"It is my opinion that the approach we have previously adopted was a mistaken one and that it is our duty to correct it rather than wait for the legislature to do it for us. The statutory terms 'common enterprise' and 'same or related purposes' of the employers should be construed to mean that their employes were engaged in some common activity which brings them within the policy underlying the subsection." (Italics supplied.)

---

[5] 13 M. S. A. 176.06, notes 18 and 24; Anderson v. Interstate Power Co. 195 Minn. 528, 263 N. W. 612; Gentle v. Northern States Power Co. 213 Minn. 231, 6 N. W. (2d) 361; Smith v. Ostrov, 208 Minn. 77, 292 N. W. 745; Urbanski v. Merchants Motor Freight, Inc. 239 Minn. 63, 57 N. W. (2d) 686; Schneider v. The Texas Co. 244 Minn. 131, 69 N. W. (2d) 329.

Mr. Justice Pirsig's concurring opinion became the cornerstone for the interpretation of the statute now before this court.

In Gleason v. Geary, 214 Minn. 499, 8 N. W. (2d) 808, Mr. Justice Olson speaking for the court based his views squarely upon Mr. Justice Pirsig's concurring opinion in the Gentle case. In that case the plaintiff's employer, who operated a hatchery plant, retained a building contractor to perform certain repair work. Certain of the hatchery owner's employees worked with the contractor's employees in the removal and pouring of a new concrete floor over which they had constructed a "catwalk" or bridge. The plaintiff, who was employed by the hatchery owner as a chicken picker, was injured while crossing the catwalk. It was held that she had not worked with the contractor's employees in the common activity of constructing the repair work even though her employer and the contractor were engaged in the common project of making repairs to a building. In holding that the plaintiff was not barred by the statute, the court made the following statements, which are relevant to the instant case (214 Minn. 507, 8 N. W. [2d] 812):

"* * * We think the obvious legislative purpose in adopting the amendment was to restore to the *injured person* an enlarged remedy against the negligent third party. * * *

\* \* \* \* \*

"Unquestionably the legislative purpose was to enlarge the rights and remedies of the injured workman."

Then Mr. Justice Olson speaking for the court quoted from Mr. Justice Pirsig's concurring opinion in the Gentle case as follows, using italics for emphasis (214 Minn. 509, 8 N. W. [2d] 813):

" '* * * The statutory terms *"common enterprise" and "same or related purposes" of the employers should be construed to mean that their employes were engaged in some common activity which brings them within the policy underlying the subsection.*' (Italics supplied.)"

By our holding in the Gleason case it is established that the statute requires a common activity of both sets of employees, and the injured employee must be engaged in that common activity before he is deprived of his common-law right of action for negligence.

While Johnson v. City of Duluth, 216 Minn. 192, 12 N. W. (2d) 192, is not analogous on the facts, it is nevertheless important for the reason that Mr. Justice Olson again speaking for the court applied the common activity of employees test, citing Tevoght v. Polson, 205 Minn. 252, 285 N. W. 893; Gentle v. Northern States Power Co. 213 Minn. 231, 6 N. W. (2d) 361; and Gleason v. Geary, 214 Minn. 499, 8 N. W. (2d) 808. From these decisions it is apparent that the "common activities of the employees test" has become the foundation for the interpretation of the statute. Again in Volding v. Harnish, 236 Minn. 71, 51 N. W. (2d) 658, the court applied the same test. That case is of interest because it is the one recent case in which the injured person was deprived of his common-law action for negligence. That case presented facts from which it was established that the employees of separate employers were engaged together in a common activity of a store opening. It was a case where, as Mr. Justice Olson expressed it in the Gleason case (214 Minn. 511, 8 N. W. [2d] 814) "the masters have joined forces and in effect have put the servants into a common pool."

The foregoing interpretation of the statutory language since the Gentle case in 1942 led to the further conclusion by this court in 1953 in Crawford v. Woodrich Const. Co. Inc. 239 Minn. 12, 20, 57 N. W. (2d) 648, 653, that the statutory phrases "common enterprise" and the "accomplishment of the same or related purposes" no longer had an independent significance and that, "in recognition of the legislative intent, *they have been wholly superseded by, and have been merged in, a new rule born of statutory construction.*" The court then went on to say:

"* * * Henceforth, therefore, the last paragraph of § 176.06, subd. 1, should be *interpreted and actually applied* as if it in fact read as follows:

" 'The provisions of subdivision 1 of this section shall apply only where the employer liable for compensation and the other party or parties legally liable for damages were both either insured or self-insured and were engaged in the due course of business,' *on the same project, and their employees were working together in the performance of such project in a manner which exposed them to the same or similar*

*hazards* on the premises where the injury was received and at the time thereof, and not otherwise. (The italicized portion represents the change in wording to carry out the legislative intent as construed in the Gleason and Swanson decisions.)"

The Crawford decision relies upon the Gleason and Swanson cases as a basis for its holding and is consistent with prior cases that have stated the test correctly.

In light of the history of the statute, its purpose and policy are served only when the employees of different employers are engaged in a common activity. Before such common activity can be said to exist there must be work in which both sets of employees participate, such as in the Gleason case where the employees of the hatchery owner and the contractor worked together in the pouring of cement and laying of a concrete floor or in the Volding case where employees of both employers were working together in preparation of the opening of a store. Where however two employers perform different types of work, such as steel construction work and plumbing, and where the performance of these jobs is not related except in a vague, general way looking toward the completion of a structure, and where the activities of the two sets of employees have nothing in common and do not share or join in any of the work between themselves, it cannot be said that the employees are within the "common activities of the employees test" of the Gentle and Gleason cases.

That the legislature intended the "common activities of the employees test" to be applied is further manifested by the fact that in 1953 the legislature revised and reenacted many sections of the Workmen's Compensation Act. The legislature has been aware of the fact that this test has been applied since 1942. We may assume that had the legislature been dissatisfied with that test it would have changed the section now before the court at the time it revised other sections of the act.

Moreover, we must respect the rule of statutory construction that a person is not to be deprived of his common-law rights unless the intention to do so is clearly expressed in the act. State Bank v. Sylte, 162 Minn. 72, 202 N. W. 70. We must further recognize that the plaintiff

should have the benefit of the rule of construction that the Workmen's Compensation Act must always be construed most liberally in favor of the injured workman. As Mr. Justice Tooze of Oregon stated in a concurring opinion in Johnson v. Timber Structures, Inc. 203 Ore. 670, 679, 281 P. (2d) 723, 727:

"The statute which denies the workman his common law right to sue for damages for injuries inflicted on him through the negligence of another, being in derogation of the common law, must be strictly construed in favor of the injured workman."

In the helpful case of Johnson v. Timber Structures, Inc. *supra,* the concurring opinion of Mr. Justice Tooze points out that, although the Oregon statute is patterned after the Minnesota statute under consideration here, the Oregon court had difficulty in following the interpretations of our court, because, as he expressed it (203 Ore. 686, 281 P. [2d] 731) "[Minnesota] decisions were to some extent in a state of confusion. No doubt this confusion arose because in its early decisions the Minnesota court had no precedents as a guide; it was pioneering." After an extended discussion of the authorities of this state he came to the conclusion that Mr. Justice Pirsig's concurring opinion in the Gentle case (203 Ore. 688, 281 P. [2d] 731) "finally became the established rule in Minnesota."

Unfortunately the word "project" has crept into the decisions of this court as a means of defining "common enterprise." That word however has added nothing but confusion and ambiguity. If the term "project" has any real significance in the light of past decisions, it can only be equated to "common activity" as Mr. Justice Pirsig defines "common activity." Only by such an interpretation does the 1923 amendment have any real significance.

In determining whether or not the record supports the findings of the court and jury that plaintiff and defendant's employees were not working together on the same project in such fashion that they were subject to the same or similar hazards, further mention of additional facts should be made. The place where the accident occurred had an area of approximately 98 by 100 feet and an overall height of 130 feet. Under defendant's contract it was required to fabricate and erect

in place the steel structure and to build a coal bunker and steel stack. It agreed to comply with workmen's compensation and employer's liability laws of the State of Minnesota and to maintain as well public liability insurance.

We do not think the record supports the claim of defendant that the employees of both employers "were necessarily working together" in the construction of the same building. There was ample evidence from which the jury could find that the employees were not working together nor was it necessary for them to work together. It is obvious from the record that the steel structure would first have to be set in place before plumbing installations could be made. The record establishes that it was never contemplated that two sets of employees should work together in the erection of the powerhouse. This appears from the testimony of the witness, Austin C. McInerny, engineer in charge of the plumbing project for plaintiff's employer. Plaintiff worked under his foreman, a Mr. Molinaro, who took his instructions from McInerny. McInerny said that on the day of the accident he "Cleared with the safety engineer of Hunkin-Arundel and Dixon and also with Andy Olson of American Bridge." Olson was the superintendent in charge of the erection of the steel structure for the defendant company. McInerny further testified:

"Q. Now would your plumbers go into an area before the steel superstructure was erected in the area they were to go into?

"A. Normally, no.

"Q. And why not?

"A. Well because it would be a hazard.

"Q. Now on that day, to the best of your knowledge, had the superstructure in the area where these men were working been completed?

"A. Yes, except riveting.

"Q. But was the riveting going on at that time on that day?

"A. Yes, but not adjacent to where they were working.

"Q. Or about?

"A. That is right."

In his testimony Mr. Olson admitted that Molinaro did confer with

him with reference to the work to be done by plaintiff's employer. He contradicted McInerny's statement to the effect that he gave permission for the plumbers to work on the structure on that particular occasion. He testified:

*"As to reference of the safety, I told him there was no safe place in the building when construction was going on."* (Italics supplied.)

We think the evidence supported the findings by the jury "that the plaintiff and the employees of the defendant were not working together in the performance of such project, * * * that the plaintiff's employer and the defendant were not engaged in the same project * * *" and "that the plaintiff and the defendant's employees were not exposed to the same or similar risks at the time and place of injury." Applying the rule in the Crawford case, which provides that the prohibitive parts of the act shall apply when the employees were "working together in the performance of such project in a manner which exposed them to the same or similar hazards," the conclusion must follow from the evidence before us that the plaintiff and defendant's employees were not working together. It is conceded that the nature of the work performed by the defendant was so hazardous and the place where the work was performed was so dangerous that it was never contemplated that these employees should work together. Here both employers were engaged independently and one would not begin work in a particular area until the other had completed its work there. Plaintiff's foreman testified, "The custom and practice that was followed before my men were assigned into an area was that the project manager would get clearance from the safety engineer and safety man to work in a given area."

Defendant further argues in support of the proposition that both sets of employees were engaged in working on the same project by asserting: "Overall supervision of the project, by the general contractor was evidenced by the appointment of a project Safety Engineer, establishment of first aid facilities and supported by common experience and general knowledge of activity that takes place on a construction project." We do not have the benefit of the testimony of the safety engineer to throw light on the manner in which it is claimed the two sets of employees worked together and the only reference we can find as to his

identity is "His first name was Mike and his last name, I couldn't tell you now." This information comes from the testimony of Mr. Olson, the defendant's superintendent in charge of construction. The following testimony of Mr. Olson is of interest as bearing upon the merit of the assertion that there was a "project Safety Engineer" who had "Overall supervision of the project."

"Q.  Did he ever consult with you as to whether it was safe for any particular workman to work in a particular area?

"A.  No.

"Q.  Did you ever advise him that it was safe for any workman to work in a particular area of the powerhouse project?

"A.  No."

Nor does it appear that both sets of employees were exposed to the same or similar hazards. The record indicates that there were about five plumbers about the premises at the time of the accident—two of whom were in the area where it occurred—and somewhere between 50 and 100 steelworkers. It appears from the record that the steelworkers were working on the north and east walls of the structure. The record indicates that in the ordinary course of carrying out their duties the plumbers did not work in an area where the structural people were working. There is testimony that sometimes tools fall off beams from parts of the superstructure and that while the work goes on rivets may fall, as a result of which the precaution is taken to clear an area from 10 to 25 feet below the point where work is being carried on. From the record it appears that even employees of the steel company do not work in an area beneath the point where such activity is being carried on. If we are to understand Mr. Olson's testimony correctly, it is comprehended that only steelworkers work in the area where steel construction is being carried on. It would appear that, because of the nature of the defendant's work, it was necessary that it be carried on independently as a separate project. It would also appear that a plumber would not be exposed to the hazard of falling beams except for the fact, as the jury found, that defendant here negligently gave clearance to plaintiff to work in the area where the accident happened. As to the hazards to which the steelworkers were exposed, there is this testimony:

"Q. As to the American Bridge Company workers, they are constantly exposed to what you say is a drifting pin or something that you drive out, or a rivet that goes by or drops, or a steel beam that swings around by the crane, they have to work exposed to that stuff most of the time don't they?

"A. Yes."

The hazards to which both sets of employees were exposed are distinct. The steelworker engaged in setting in place parts of a steel structure is exposed to those dangers which are incidental to men whose employment requires them to work at great heights where they are in danger of being struck by moving beams and falling rivets. It does not appear from the record however that in practice they are exposed to being struck or hit by channel iron or other objects which might fall from places where other workmen are stationed above them. It is also apparent that the steelworkers are not exposed to any of the hazards which are inherent in the occupation of a plumber. E. I. Du Pont De Nemours & Co. Inc. v. Frechette (8 Cir.) 161 F. (2d) 318, 322; Volding v. Harnish, 236 Minn. 71, 51 N. W. (2d) 658.

We are satisfied on the record that plaintiff and the employees of defendant were not "working together" or engaged in a "common activity" on the same project in such fashion that they were subject to the same or similar hazards.

■ The next point relates to the alleged error on the part of the trial court in instructing the jury as to the effect of their answers to the interrogatories propounded in the special verdict. Rule 49.01 of Rules of Civil Procedure states the following with respect to special verdicts:

"* * * The court shall give to the jury such explanations and instructions concerning the matter thus submitted as may be necessary to enable the jury to make its findings upon each issue."

The rule does not make any statement with respect to the propriety of the court's informing the jury expressly or by necessary implication of the effect their answer would have on the ultimate disposition of the case nor has this court decided the question. There is authority to the effect that it is prejudicial error for the trial court in its instructions to inform the jury expressly or by necessary implication of the effect of an

answer to a question of the special verdict upon the ultimate right of either party. Ruddy v. New York Cent. R. Co. (N. D. N. Y.) 124 F. Supp. 470; Nordbye, *Use of Special Verdicts Under Rules of Civil Procedure*, 2 F. R. D. 138, 139; Nordbye, *Comments on Selected Provisions of the New Minnesota Rules*, 36 Minn. L. Rev. 672, 682; Wright, Minnesota Rules, p. 280; 2 Youngquist & Blacik, Minnesota Rules Practice, p. 484; 2 Barron & Holtzoff, Federal Practice and Procedure (Rules ed.) § 1051, p. 736; Pecor v. Home Ind. Co. 234 Wis. 407, 419, 291 N. W. 313, 319; Continental Oil Co. v. Barnes (Tex. Civ. App.) 97 S. W. (2d) 494, 496; Mitchell v. Perkins, 334 Mich. 192, 54 N. W. (2d) 293; Ferderer v. N. P. Ry. Co. 77 N. D. 169, 185, 42 N. W. (2d) 216, 225.

One purpose of the special verdict is to permit the jury to make findings of ultimate facts, free from bias, prejudice, and sympathy and without regard to the effect of their answers upon the ultimate outcome of the case. In the case before us the trial court at various times in its instructions explained to the jury the conditions under which the plaintiff might "maintain" the action against the defendant. While it is true the court did not categorically tell the jury the conditions upon which the plaintiff might "recover," it is our view that, by explaining the conditions under which the plaintiff might "maintain" the action, the effect of the instruction was the same. We think it should be apparent to the average juror that in order to recover the plaintiff must first have the right to maintain an action. Accordingly the effect of the instruction was to inform the jury as to the consequence of their answers to the special interrogatories. The question for us to decide however is whether or not those instructions were prejudicial.

It should be acknowledged that cases of this kind cannot be tried before a jury in a vacuum and that in order to understand the issues the jury must necessarily know something of the background and setting of the lawsuit. It is not realistic to assume that jurors called upon to answer questions in a special verdict do not have intelligent ideas as to the result their answers will have. See, Swiergul v. Town of Suamico, 204 Wis. 114, 121, 235 N. W. 548, 551; Wankowski v. Crivitz P. & P. Co. 137 Wis. 123, 129, 118 N. W. 643, 645; Bergstrom Paper Co. v. Continental Ins. Co. (E. D. Wis.) 75 F. Supp. 424, 427;

Nordbye, *Comments on Selected Provisions of the New Minnesota Rules,* 36 Minn. L. Rev. 672, 685; Wright, Minnesota Rules, p. 280. Nevertheless the majority of this court is of the view that the error of the court in indicating the effect of the answers to the interrogatories requires a new trial.[6] The controlling thought behind the special verdict "is to free the jury from any procedure which would inject the feeling of partisanship in their minds, and limit the deliberations to the specific fact questions submitted."[7] It is the view of the majority that if the rule to the effect that it is prejudicial error for the trial court in its instruc-

---

[6] It is the writer's view that Rule 49.01, which provides in part that the trial court in addition to the submission of a special verdict "may use such other method of submitting the issues and require written findings thereon as it deems most appropriate," contains a broad grant of discretion in the choice of trial devices and places upon the trial court the responsibility of giving the case to the jury "not according to any special system of dialectics, but in a way which is simple, fair, and understandable, and which allows the jury their traditional share in deciding controversies in the light of their sense of justice." McCormick, *Jury Verdicts upon Special Questions in Civil Cases,* 2 F. R. D. 176, 181. In the case before us the jury considered questions relating to the issues of negligence, contributory negligence, the assumption of risk, and the further issue as to whether the plaintiff's claim was barred by the provisions of § 176.061, subds. 1 and 4. In the course of the trial evidence was submitted with respect to duties performed by employees of the respective employers, the locations in which the two sets of employees worked, the type of work performed, the hazards to which the workers were exposed, as well as the general circumstances of their employment. It is apparent that it would have been difficult for the court to instruct the jury on the burden of proof applicable to the various issues without some indication of the effect of the answers. We do not have the arguments of counsel to the jury before us but it may be assumed that when they argued for given answers the jury could hardly escape the inference that the answer for which counsel contended would be favorable to his client. The subject matter of the trial was such that the jury would be expected to know the effect of their answers to the interrogatories without being told by the court. I do not think it can be fairly said that it is prejudicial for the court in its instructions to indicate to the jury information which it already has. Concord Co. v. Willcuts (8 Cir.) 125 F. (2d) 584 (appeal from U. S. District Court, Minn.). These views, however, are not shared by the majority.

[7] Nordbye, *Use of Special Verdicts Under Rules of Civil Procedure,* 2 F. R. D. 138, 139.

tions to inform the jury expressly or by necessary implication of the effect of an answer to the special verdict upon the ultimate right of either party to recover is to have any force or meaning, it must be applied in the case before us, particularly in view of the fact that the verdict as originally returned by the jury was admittedly excessive. In expressing the views of the majority, it should be pointed out that in his complaint the plaintiff asks for damages in the sum of $50,000. His motion to amend the complaint so as to ask for damages in the sum of $65,000 was denied. The jury returned a verdict in the sum of $65,000. By order of the court the finding of the jury as to damages was modified and reduced to $50,000 and later reduced to the sum of $40,000, to which latter order the plaintiff consented in lieu of a new trial. We cannot ignore the fact that the verdict, which was so excessive as to indicate that it was rendered under the influence of passion and prejudice, was returned by the jury pursuant to an instruction which breached a rule designed to prevent the play of passion and prejudice.

It is recognized that the trial court is given broad discretion to employ any of the trial devices indicated by Rules 49.01 and 49.02; however, once the court determines to submit the issues to the jury by special verdict, the recognized safeguards for the use of that procedure should be observed. The use of the special verdict permits the jury to concentrate on the facts without being troubled by attempting to understand the court's charge or the consequences of its answers to definite questions of fact. In that procedure the instructions are abbreviated and not as complete as the instructions given when a general verdict is submitted. Of course, the trial court could have submitted the issues to the jury on interrogatories with appropriate forms for a general verdict. Had it done so, both parties would have had the benefit of full and complete instructions. For the reasons indicated we hold that there was prejudicial error in the instructions which requires a new trial.

Reversed and new trial granted.

KNUTSON, JUSTICE (concurring specially).

I concur in the result of this decision in so far as it holds that it was error on the part of the trial court, in submitting the case on a special verdict, to inform the jury what the result of its findings on the facts

would be. Under Rule 49.01 of Rules of Civil Procedure, it is discretionary with the trial court whether the case should be submitted to the jury on a special verdict, but, if such verdict is used, it should be used properly. Any other procedure would destroy the value of the rule entirely.

I cannot concur, however, in the construction placed on M. S. A. 176.061. I think that employees of contractors and subcontractors working on the same project are within the meaning of our statute and that our former decisions all so hold.

In construing a statute passed by the legislature, courts have only one function to perform. That is to ascertain the legislative intent and to give to the language used by the legislature such meaning as to carry out that legislative intent. If the language used in the statute is unambiguous, it is our duty to give to it the usual and ordinary meaning of such language. If the language of the statute is ambiguous, it still is our duty to give to it such meaning as to carry out the intention of the legislature as we understand that intention to be. Sometimes we must look to the purpose which the legislature sought to accomplish in order to properly interpret language used by it when the meaning of such language is not clear. What the legislature sought to accomplish by this statute is quite clearly indicated in the concurring opinion of Mr. Justice Pirsig in Gentle v. Northern States Power Co. 213 Minn. 231, 237, 6 N. W. (2d) 361, 364, which is so heavily relied upon by the majority. In that opinion he said:

"Undoubtedly, it was the thought of the legislature that it was unjust that the rights and protection afforded several workmen of different employers under the workmen's compensation act should be different when these employes were working together on the same premises, on the same project, and subject to the same risks of injury. The subdivision under consideration sought to carry out that policy."

This language was quoted with approval in Gleason v. Geary, 214 Minn. 499, 8 N. W. (2d) 808, also relied upon by the majority. That contractors and subcontractors working on the same project were within the purpose for which this legislation was enacted was recognized even before the Gentle case. In Tevoght v. Polson, 205 Minn. 252, 254,

285 N. W. 893, 894, we said:

"* * * It may be that it [the legislature] intended that his common-law right of action should only be eliminated in situations like those where contractors and subcontractors are engaged on the same project and their employes exposed to the hazards created by such mutual engagements."

In no case do we have a right to substitute for the language used by the legislature language of our own choosing in order to arrive at a result which we think will be better, from a social and economic point of view, than the result which the legislature intended to accomplish. It seems to me that that is exactly what we are doing here. In our role as interpreter of the laws passed by the legislature, only the exercise of judicial self-restraint prevents usurpation of the lawmaking function of the legislature. If our theory of separation of powers, which is the very backbone of our constitutional form of government, is to retain vitality, it is of the utmost importance that we conscientiously exercise such self-restraint.

The language of the statute we have under consideration (§ 176.061, subd. 4), as far as is material here, reads as follows:

"The provisions of subdivisions 1, 2, and 3 apply only where the employer liable for compensation and the other party legally liable for damages are * * * engaged in the due course of business, (a) in furtherance of a common enterprise, or (b) the accomplishment of the same or related purposes * * *."

The majority opinion now says that, in order to come within this statutory language, there are three requisites:

"(1) The employers must be engaged on the same project;

"(2) The employees must be *working together* (common activity); and

"(3) In such fashion that they are subject to the same or similar hazards."

The majority opinion says: "This interpretation of the statute emphasizes the *common activities of the employees* as opposed to the *common activities of the employers* * * *." No doubt the interpretation

placed on the statute in this case does do just that, but it is difficult to see how that interpretation can be made, either from the language used in the statute or any purpose which the legislature could have intended to accomplish by the enactment of the statute, or from what we have heretofore believed its purpose to be.

While it seems fruitless to discuss our prior cases on this subject, many of which cannot be reconciled, the majority claims to arrive at the present interpretation of the statute from our former decisions. The common activities of employees, which have now been substituted for the common enterprise of employers or the accomplishment by employers of the same or related purposes, have heretofore been used only in connection with the mutuality-of-hazards idea which first appeared in Gleason v. Geary, *supra.* The method whereby this language is now extended so as to supersede the language of the statute is simple. The majority quotes from Swanson v. J. L. Shiely Co. 234 Minn. 548, 558, 48 N. W. (2d) 848, 854, the following language:

"* * * the legislature intended that an employe's common-law right of action be eliminated only where two or more employers subject to the act are engaged on the same project and *their employes are working together in such fashion that they are exposed to the same or similar hazards created by such mutual engagements and are exposed to the same risks of injury.*" (Italics supplied.)

The meaning of the clause, "their employes are working together in such fashion that they are exposed to the same or similar hazards created by such mutual engagements and are exposed to the same risks of injury," is changed by the simple expedient of inserting the conjunctive "and" in the middle of the clause so as to find in it two requisites instead of one and by eliminating entirely a part of the clause. Thus, after such rearrangement, it will read: "their employes are working together *and* in such fashion that they are exposed to the same or similar hazards." The words, "created by such mutual engagements," are left out entirely. Thus do the words, "working together," become one of the requisites and the balance of the clause another requisite under the new rule without reference as to how these words were used in the opinion from which they were extracted. Having so changed the meaning of the

sentence taken from the Swanson case, the majority now arrive at the conclusion that it is the common activities of the employees that constitutes the criteria.

From the very beginning we have held that employees whose employers are working on the same project were within the statute. Since Gleason v. Geary, *supra,* we have also required that the employees be exposed to the same hazards.

It is true that in the concurring opinion of Mr. Justice Pirsig in the Gentle case he comes to the conclusion that (213 Minn. 238, 6 N. W. [2d] 364):

"* * * The statutory terms 'common enterprise' and 'same or related purposes' of the employers should be construed to mean that their employes were engaged in some common activity which brings them within the policy underlying the subsection."

This statement is not inconsistent with a holding that employees of contractors and subcontractors working on the same project (that is, the same building) are engaged in a common activity. After reviewing our former decisions, we finally came to the conclusion in Crawford v. Woodrich Const. Co. Inc. 239 Minn. 12, 20, 57 N. W. (2d) 648, 653, that the term "common enterprise" and the "accomplishment of the same or related purposes" had been merged into a new rule born of statutory construction and that henceforth the statute should be interpreted and actually applied as if it read:

" 'The provisions of subdivision 1 of this section shall apply only where the employer liable for compensation and the other party or parties legally liable for damages were both either insured or self-insured and were engaged in the due course of business,' *on the same project, and their employees were working together in the performance of such project in a manner which exposed them to the same or similar hazards* on the premises where the injury was received and at the time thereof,[8] and not otherwise."

That case was decided by a unanimous opinion of this court in 1953.

---

[8]This is substantially the same language found in the Swanson case which I have discussed above.

The majority now hold in effect that the word "project" should be discarded and still another rule adopted and seemingly base that contention on the decisions of this court, all of which were reviewed in deciding the Crawford case.

This court's understanding of the interpretation of the statute in the Gleason case may be gleaned from former decisions. In Volding v. Harnish, 236 Minn. 71, 77, 51 N. W. (2d) 658, 662, we said:

"In Gleason v. Geary, 214 Minn. 499, 500, 8 N. W. (2d) 808, 809, the terms 'common enterprise' or 'related purposes' as used in § 176.06, subd. 1, were limited to situations where the respective employes of two or more employers were found to be 'engaged on the same project and thereby exposed to the same or similar hazards.' The test there applied had previously been suggested in the concurring opinion of Mr. Justice Pirsig in Gentle v. Northern States Power Co. 213 Minn. 231, 6 N. W. (2d) 361. * * *

"Based on this test, before the statute becomes applicable, it must be established that the injured employe was actually working on the same project with the employes of the third party so as to be exposed with them to the same or similar hazards."

In that case we held that the employes of different employers were working on the same project; hence that they were within the statute. As to the nature of their work, we said (236 Minn. 78, 51 N. W. [2d] 662):

"On the date of the injury, plaintiff had arrived at the store to carry out the obligations of his employer in bringing about the above result [that is, to open a new store]. Under his control and direction were other employes of Butler Brothers who had various functions in connection with preparing defendant's store for the opening. These functions included preparation of the sales floor, unpacking, pricing, and placing of merchandise, trimming of windows, placing of cash registers, instructing defendant's sales organization, preparing advertising, work in the stock rooms, and like activities. In performing this work, the employes of Butler Brothers worked closely with defendant's store manager, Kenneth P. Johnson, and other employes of defendant."

If that case were before us today, in the light of the majority opinion, would we now hold that the employees of one employer who were preparing the sales floor were engaged in the same activities as employees of another employer unpacking merchandise or placing it on display counters for sale? Would we hold that the employees of one employer trimming windows were engaged in the same activity as employees of another employer working in the store room? That is what we did hold in the Volding case, but, under the present decision, it seems to me that we would have to hold just the opposite.

That contractors and subcontractors working on the same project are within the statute has been recognized in this court at least since our decision in Tevoght v. Polson, 205 Minn. 252, 285 N. W. 893. The language from that case quoted above clearly shows this to be true. In 1 Schneider, Workmen's Compensation Law (2 ed.) §§ 44, 45, p. 359, we find the following:

"* * * The most usual case of an employer and a third person tort-feasor engaged in a common enterprise or in the accomplishment of related purposes is that of a principal contractor and a sub-contractor."

In many of our decisions we have said that Minnesota stands alone in having a provision such as this and that there is no counterpart to it in the law of other states.[9] That is not entirely accurate. In 1937 Oregon adopted a statutory provision (Ore. Rev. Stat. § 656.154) to some extent, at least, patterned after our act.[10] The Oregon statute had one requirement that we did not have, to wit, that the two employers have joint supervision over the project on which the employee was engaged. However, as far as the language involved in this case is concerned, the language of the statutes is identical.

It is interesting to note the interpretation placed on this language by the Oregon court. In Inwall v. Transpacific Lbr. Co. 165 Ore. 560,

---

[9]See, Manteuffel v. Theo. Hamm Brg. Co. 238 Minn. 140, 56 N. W. (2d) 310.

[10]For an interesting discussion of the adoption of the Oregon statute and the attempt of the Oregon court to reconcile the Minnesota decisions, see the concurring opinion of Mr. Justice Tooze in Johnson v. Timber Structures, Inc. 203 Ore. 670, 281 P. (2d) 723.

570, 108 P. (2d) 522, 526, in discussing whether employees of two separate employers were engaged in a common enterprise, the Oregon court said:

"* * * They were as much 'engaged in the furtherance of a common enterprise' at that place *as is the brick mason, the carpenter, the plasterer, the plumber and the electrician in the construction of a house. The services of all those men 'in the furtherance of a common enterprise' are essential to the construction of the finished house.* * * *

\* \* \* \* \*

"* * * To become 'engaged in the furtherance of a common enterprise' it is not essential that the workmen formally enter into an agreement to that effect. *All that is essential is that they* occupy the same premises and *perform component parts of a general undertaking.*"[11] (Italics supplied.)

The majority would hold that the employee of a subcontractor performing carpentry who drills a hole through the studdings of a house in the process of construction would not be engaged in the same activity as the employee of a subcontractor doing the electrical work who inserts a wire through the hole. The only difference between that illustration and the facts of the instant case is that the project we are dealing with here is larger.

The majority also hold that the employees of these two contractors were not exposed to the same hazards.

In Crawford v. Woodrich Const. Co. Inc. 239 Minn. 12, 19, 57 N. W. (2d) 648, 653, we said:

"A consideration of the rule as applied to the *employees* and the *hazards,* with reference to *such mutual engagement,* leads to the inevitable conclusion that the employees must be engaged in the performance of the *same project* of the employers. In applying the rule we have recognized that the 'same project' need not necessarily *create* the 'same or similar hazards' to which the employees are exposed and that it is only necessary that the 'same project' exposes them to such

---

[11]See, also, Atkinson v. Fairview Dairy Farms, 190 Ore. 1, 222 P. (2d) 732.

hazards. In other words, it is the *exposure* rather than the *creation* of the hazards which makes the rule applicable."[12]

The evidence here shows that, when the pieces of steel fell out of the bundle and started cascading down the superstructure, everyone ran for cover. It so happened that the falling steel did not hit any of the steelworkers but did strike plaintiff. It is conceivable that the same piece of steel or different pieces out of the same bundle could have struck both steelworkers and plumbers. It was only because of their adroitness that the steelworkers escaped.

The majority seek to justify the holding that they were not exposed to the same dangers by pointing out that steelworkers and plumbers were not supposed to be working at the same time. The simple truth of the matter is that at the time of this injury they were working at the same time. If they were then exposed to the same hazards, which I fail to see how we can deny, it is immaterial what they were supposed to do on some other occasion.

It cannot be denied that the interpretation of this statutory provision has presented this court with many difficulties in the past. We have, however, heretofore tried to construe it so as to give it a meaning which would carry out the purposes which the legislature sought to accomplish. It seems to me that we now depart from that fundamental rule of interpretation. We neither clarify the law or our former decisions. What we in effect are doing is to repeal the statute by a process of judicial construction. It is difficult to imagine any situation where the statute can now have any application. I think that we should be frank enough to say, in view of this decision, that we will give it no consideration in the future. Probably the result we have arrived at is a good one from a social point of view, but it seems to me that it is not our function to determine what social paths we should follow in the future. If the statute is to be amended or repealed, the prerogative to do so lies with the legislature and not with the courts. It is unfortunate, of course, in view of the difficulty we have had in the past in construing this statute that the legislature had not done something to clarify the law, but it

---

[12]See, also, Volding v. Harnish, 236 Minn. 71, 51 N. W. (2d) 658; Breimhorst v. Beckman, 227 Minn. 409, 421, 35 N. W. (2d) 719, 728.

still remains a fact also that our function, as long as the statute exists as it does, is to seek some pattern of construction consistent with the intent of the legislature and to give to the language used such meaning as will carry out that intent. We tried to do that in the Crawford case, which we now discard. It seems to me clear that our decisions contemplate, if they do not hold, that subcontractors engaged in performing component parts of the same construction are engaged on the same project and are within the statute. Obviously, the purpose of this statute was to place all employees working on the same project in the same position with respect to their rights of recovery if any of them were injured. That is what Mr. Justice Pirsig said in Gentle v. Northern States Power Co. *supra,* and that is what we have indicated in other decisions. It would seem unrealistic that the legislature had any other purpose in mind, and this decision now completely destroys that purpose. I think that defendant is entitled to judgment as a matter of law.

MATSON, JUSTICE.

I join in the special concurrence of Mr. Justice Knutson.

DELL, CHIEF JUSTICE.

I join in the special concurrence of Mr. Justice Knutson.