Daniel BREWER, Plaintiff,

v.

JEEP CORPORATION; American Motors Sales Corporation and American Motors Corporation, Defendants.

Civ. No. 81–5052.

United States District Court,
W. D. Arkansas,
Fayetteville Division.

Aug. 31, 1982.

Phillip Carroll, Rose Law Firm, Little Rock, Ark., for plaintiff.

Tilden P. Wright III, Davis, Cox & Wright, Fayetteville, Ark., for defendants.

## MEMORANDUM OPINION

H. FRANKLIN WATERS, Chief Judge.

This is a Jeep rollover case in which the plaintiff, Daniel Brewer, filed suit in this court on May 7, 1981, alleging that on July 27, 1980, in McDonald County, Missouri, he suffered severe personal injuries and substantial resulting damages caused when a 1979 Jeep CJ–5 vehicle owned and operated by him overturned. It is alleged that the rollover resulted from certain negligence and breaches of warranty on the part of the defendants, Jeep Corporation, American Motors Sales Corporation and American Motors Corporation. Plaintiff prayed for damages totaling $3,030,447.73.

The matter was extensively tried to a jury by competent counsel, commencing on Monday, June 28, 1982, and concluding with a jury verdict in favor of the defendants on July 3, 1982.

The defendants have filed a motion for new trial and a concurrent motion for permission to question jurors. The attorneys for both parties have extensively briefed the questions presented by these motions and the Court is now prepared to rule.

Let the Court first indicate that this was a case, like many cases of this nature, in which, during the course of a long and combative trial, certain emotions naturally evolve. The plaintiff and his family and the attorneys for the plaintiff were naturally disappointed and upset by the result, and the Court recognizes that this is undoubtedly the reason for the somewhat strident and accusatory tone of plaintiff's motion and brief in support.

In spite of the emotions generated, the Court is convinced that the "system" worked in this case and that, while the result was obviously not what the plaintiff or his attorneys desired, it is what the system produced. The Court is convinced that it was produced by the system after it had been allowed by the Court to work as designed.

We will not discuss in any detail the very divergent testimony that was presented in four and one-half days of a well-tried case, but, suffice it to say, that there was certainly substantial evidence from which any

reasonable person could have determined, just as the jury did, that the accident and resulting injuries were caused, predominantly, by the negligence of the plaintiff, and not by substantial negligence on the part of the defendants.

In the motion for new trial, the plaintiff argues that the Court erred as follows:

1. The Court erred in not submitting the emergency situation instruction (AMI 614) to the jury.

2. The Court erred in not allowing the plaintiff to introduce the Milliken-Rice films without having to introduce the entire written report.

3. The Court erred in not reviewing the Milliken-Rice films and the report before making its ruling.

4. The Court erred in not allowing the entire Dynamic Science film to be shown to the jury in light of the defendants' theory that Danny Brewer would not have been seriously injured had he been wearing a seat belt.

5. The Court erred in not allowing plaintiff's expert witnesses to testify about experience with other Jeep rollover cases where occupants had worn seat belts.

6. The Court erred in striking the plaintiff's claim for punitive damages.

7. The Court erred in not allowing plaintiff's expert witnesses to testify on the reduced rollover and injury rate of the Army M115 series after warnings and special training programs were begun.

8. The Court erred in submitting the case to the jury by special interrogatories.

At the time that the Court ruled as it did in relation to the matters contained in the first seven grounds listed above, the Court gave its reasons for so ruling, in the record. The Court believed then and now believes that it was correct in making these rulings and it would not serve any useful purpose to reiterate the reasons. Suffice it to say that the Court is convinced now as it was then: that it was not proper for it to submit the emergency situation instruction (AMI 614) in view of the evidence adduced at this trial; that it was not proper for the Court to allow the jury to view certain video tapes called the Milliken-Rice films without also allowing the jury to have access to the written reports which make these films understandable; that it would have been a waste of the Court's time and the time of all of the litigants and the attorneys for it to have viewed the Milliken-Rice films and the reports since the attorneys for the parties did not disagree as to the contents and advised the Court of the contents in considerable detail; that it was not proper for the Court to have allowed the jury to see the entire Dynamic Science film which showed dummies, which admittedly did not have the ability to even attempt to hold on to anything, flailing about in the vehicle and losing legs, heads and arms in the process, with the Court being convinced that the jury did see the portions of the Dynamic Science films which were not prejudicial and which were relevant to the issues in the case; that it would not have been proper for the Court to have allowed plaintiff's experts to testify about lawsuits and other rollover incidents which have occurred and the results to the occupants of the vehicles, incidents which, in most cases, did not arguably occur under similar facts or situations; that it would have been error for the Court to allow the jury to consider the claim for punitive damages because the evidence simply did not warrant such a submission; and that it certainly would have been error for the Court to have allowed witnesses to testify about the result of certain warnings and special training programs conducted by the United States Army in an environment which doesn't even arguably come close to the environment in which the seller of motor vehicles to the general public is confronted.

However, the Court feels that it would serve a useful purpose to discuss the remaining issues raised by plaintiff's motion

and, in fact, feels compelled under the circumstances to do so.

The plaintiff argues that the Court erred in submitting the case to the jury on a special verdict, and that, because the jury was confused by the special verdict, the Court should take the unusual course of allowing the plaintiff to question the jury on their intention in returning the verdict. Since these two issues are somewhat interwoven, the Court will discuss them together.

As was already indicated, four and one-half days of very divergent testimony, much of it from experts, was taken during the course of the trial, and the matter was more than adequately tried by both sides.

At the close of the testimony which occurred around noon on Friday, July 2, the Court, in chambers, advised the attorneys for the parties of the instructions that it intended to give, and at that time informed the attorneys that it intended to submit the matter to the jury on a special verdict. The attorneys were advised that the jury would first be sent out, after instruction, with three interrogatories as follows:

INTERROGATORY NO. 1: Do you find from a preponderance of the evidence that one or more of the defendants was guilty of fault which was a proximate cause of the occurrence?

ANSWER: _____ (Yes or No)

_____   _____
Date                    Foreperson

INTERROGATORY NO. 2: Answer this interrogatory only if you have answered "yes" to Interrogatory No. 1:

Do you find from a preponderance of the evidence that Daniel Brewer was guilty of fault which was a proximate cause of the occurrence?

ANSWER: _____ (Yes or No)

_____   _____
Date                    Foreperson

INTERROGATORY NO. 3: If you find that both plaintiff and one or more defendants were guilty of fault, then answer this interrogatory:

Using 100 percent to represent the total responsibility for the occurrence and any injuries or damages resulting from it, proportion the responsibility between the parties whom you have found to be responsible.

ANSWER:    Daniel Brewer    _____%
           Defendants       _____%

_____   _____
Date                    Foreperson

The attorneys were advised that, depending upon how the jury answered these interrogatories, it might or might not be directed to return to consider an interrogatory on damages which, in the event that it was necessary, would be as follows:

INTERROGATORY NO. 4: State the amount of damages which you find from a preponderance of the evidence was sustained by Daniel Brewer.

ANSWER:       $_____

_____   _____
Date                    Foreperson

One of the attorneys for the plaintiff objected to the case being submitted on interrogatories and stated that he thought that the case should be submitted on a general verdict. The Court overruled these objections.

Closing arguments were then had, and the jury was instructed as the Court had advised the attorneys for the parties that it intended to, and the jury was sent to the jury room to deliberate at approximately 3:55 p. m. with the three interrogatories first listed above. The jury deliberated until approximately 9:30 that night when the Court was sent a note signed by the foreperson, Ms. Barrett, stating that the jury had not reached a verdict, but that it was felt that they could, and it was requested that they be allowed to retire for the night. They requested that they be allowed to commence deliberation at 7:30 a. m. on Saturday, July 3, and, with that understanding, the jury was released for the night, after being instructed that they were not to discuss the case with anyone.

The jury then returned and commenced deliberation at the scheduled time on July 3 and at approximately 8:40 a. m. a note was sent to the Court, signed by the foreperson, stating: "We have a jury member who feels there is nothing we can say, or any evidence we can show him, to change his mind. What should we do?"

The Court then, in chambers, discussed the note with the attorneys for the parties,

and gave each of the attorneys a copy of an additional instruction that it proposed to give. There was no objection by the attorneys for any of the parties, so the Court went back into session and the jury was returned to the courtroom. Without objection, the following instruction was read:

Members of the Jury:

I am going to ask that you continue your deliberations in an effort to agree upon a verdict and dispose of this case; and I have a few additional comments I would like for you to consider as you do so.

This is an important case. The trial has been expensive in time, effort and money to both the plaintiff and defendant. If you should fail to agree on a verdict the case is left open and must be tried again. Obviously, another trial would only serve to increase the cost to both sides, and there is no reason to believe that the case can be tried again by either side better or more exhaustively than it has been tried before you.

Any future jury must be selected in the same manner and from the same source as you were chosen, and there is no reason to believe that the case could ever be submitted to twelve men and women more conscientious, more impartial, or more competent to decide it, or that more or clearer evidence could be produced.

In your deliberations jurors have a duty to consult with one another and to deliberate with a view to reaching an agreement if it can be done without violence to individual judgment. Although each juror must decide the case for himself, this should only be done after an impartial consideration of the evidence with his fellow jurors.

In the course of your deliberations a juror should not hesitate to reexamine his own views and change his opinion if convinced it is erroneous. Each juror who finds himself to be in the minority should reconsider his views in the light of the opinion of the jurors of the majority. If much the greater number of you are for a particular conclusion, each dissenting juror ought to consider whether his or her position is a reasonable one, since it makes no effective impression upon the minds of so many equally honest, equally conscientious fellow jurors, who bear the same responsibility, serve under the same oath, and have heard the same evidence with, we may assume, the same attention and an equal desire to arrive at the truth. However, no juror should surrender his honest conviction as to the weight or effect of the evidence for his fellow jurors or for the purpose of reaching a verdict.

But remember also that after full deliberation and consideration of all the evidence it is your duty to agree upon a verdict if you can do so without violating your individual judgment and conscience.

You may be as leisurely in your deliberations as the occasion may require and should take all the time which you may feel is necessary.

I will ask now that you retire once again and continue your deliberations with these additional comments in mind to be applied, of course, in conjunction with the other instructions I have previously given you.

At approximately 10:45 a. m. the Court was advised that the jury had reached a unanimous verdict. The jury was then brought into the courtroom and placed in the jury box. The Court then asked the foreperson, Ms. Jane Barrett, if the jury had reached a verdict on the three interrogatories that had been submitted, and Ms. Barrett replied affirmatively. Ms. Barrett was then asked if the verdict was the unanimous verdict of the entire jury and Ms. Barrett again answered that it was. The verdict was handed to the Court, and each of the verdict forms had been completed, dated, and signed by the foreperson. The jury had answered Interrogatory No. 1 "Yes"; Interrogatory No. 2 "Yes"; and Interrogatory No. 3 "Daniel Brewer, 89%;

Defendants, 11%." The Court again asked the jury foreperson if the verdict was the unanimous verdict of the jury and again Ms. Barrett responded that it was. The jury was then told by the Court that they had decided the case by the manner in which they had answered these interrogatories, and that it was not necessary for them to answer any further interrogatories.

Mr. Phil Carroll, one of the attorneys representing the plaintiff, then requested that the jury be polled since it now had been told of the effect of the verdict. The Court explained to the jury that each of them was going to be polled and asked if this was their verdict and that they were to give their answer without concern as to what effect they think the verdict might have or what effect they intended for it to have, "but only whether these questions as answered and as read by the Court were their verdict." The jury was polled and each of the members stated that it was their verdict, with juror number one, Mr. Goodlet, stating: "Yes, it is my verdict, as far as it goes."

The jury was then again advised by the Court that they had decided the case and, at the request of the attorney for the defendants, the Court explained to the jury that, since they had unanimously found that Mr. Brewer was guilty of 89% of the negligence or fault which caused the accident, the law of Arkansas does not allow him to recover any amount.

Mr. Carroll then asked that, since the jury had now been told about the effect of their verdict, they again be polled and asked if this was their intention. The Court declined to do so.

At this point, the jury was thanked and told that they were relieved and could leave. Foreperson Barrett then asked if she could speak and the Court advised her that if she intended to speak about what her intent was in reaching the verdict returned, or what the intent of other jurors was, she would not be allowed to do so. She made no further attempt to speak.

Juror Hencey then attempted to speak and the jury was advised that they had completed their job and were released. They then retired.

In their brief in support of the motion for a new trial, the attorneys for plaintiff argue that: "Danny Brewer has suffered a grave injustice because the jury did not know the consequences of their actions or what they were doing." Then, after stating the conclusion that "it is obvious that some very serious compromising took place after the dynamite instruction was given," the plaintiff concludes:

> Plaintiff believes it is reasonable to assume this compromise was at the expense of the Plaintiff since when the jury came back into the court room many of them were smiling warmly at the Plaintiff. It is doubtful that they would have been smiling at Danny Brewer if they had known the effect of their decision. The court is well aware of the jury's reaction to being told that the case was over after the sending of the interrogatories. No comment is needed to remind the court of the shock that covered the faces of many of the jury members. Plaintiff can only speculate as to what was passing through the minds of those jurors who exhibited a desire to communicate with the court.
>
> What kind of justice is this? Should we perpetuate a system where the ultimate effect of the jury's ruling upon the life and future of a young man is hidden, is kept secret from the jury? Why should we decide cases in this way? What is the jury to assume about the effect of their verdict. They have no way of knowing what the law is and obviously they were guessing as to what it was and guessed wrong. . . .

If the plaintiff's attorneys were, indeed, able to gain all of that from what they believed to be the facial expressions of individual jurors as they returned to the courtroom, they have an insight into human nature and, perhaps, a power which is not possessed by the average individual, and

certainly not by this Court. As indicated above, all that we know is that when the jury returned, two of the jurors evidenced a desire to speak after the effect of their verdict was explained to them, and the Court did not allow them to do so because it believed then, as now, that since the verdict was regular on its face, it would have been error for it to inquire into the jury's reason for reaching the verdict and error for it to have allowed individual members of the jury to express what their intention was in arriving at the verdict. It certainly would have been error for the Court to have allowed the jury to "change its mind," and since this is true, what argument could be made with any merit whatsoever that it was pertinent for the individual members to be allowed to express their views on what was intended.

The plaintiff and his attorneys are understandably disappointed about the result reached and, as a result of an adverse decision, contend that the Court should not have submitted the matter to the jury on a special verdict. In doing so, what they really argue, when it is boiled down to its essentials, is that they believe that some of the jurors indicated that they wanted Mr. Brewer to recover regardless of how negligent he was. In other words, the contention is that, because the Court submitted the matter on a special verdict, the jury was not allowed to let sympathy and prejudice rule.

We should not forget that what the jury unanimously did is find that the plaintiff was responsible for 89% of the fault which resulted in the accident, and that Jeep was responsible for 11%. They were asked more than once if this was the unanimous verdict of the jury and, even after being told that they had decided the case, when polled they unanimously stated that they had intended to answer the interrogatories as they did. If, in fact, some of the jurors wanted to award Mr. Brewer damages in spite of the fact that they believed that he had been responsible for 89% of the fault which re-

sulted in the accident, the Court can say without equivocation that this does not indicate that they were confused, but, instead, indicates that the Court's decision to submit the matter on interrogatories was warranted under the circumstances. It resulted in exactly the verdict required by the law of Arkansas.

Ark.Stat.Ann. § 27–1765 provides in pertinent part: "If the fault chargeable to a party claiming damages is equal to or greater in degree than any fault chargeable to the party or parties from whom the claiming party seeks to recover damages, then the claiming party is not entitled to recover such damages." The Court did not write that law, it was written by the legislature of the State of Arkansas and is binding upon the parties in this case. The jury was asked by the Court to determine what portion of the fault was chargeable to Mr. Brewer and what portion to Jeep, and they did so, finding that Brewer was charged with 89% of the fault. As indicated above, the elected representatives of the people had clearly legislated that when that occurs, the party seeking damages recovers nothing. This is not something the Court did; all that the Court did was apply the law after the jury had unanimously determined the applicable facts.

Rule 49 of the Federal Rules of Civil Procedure provides:

"The Court may require a jury to return only a special verdict in the form of a special written finding upon each issue of fact. In that event the Court may submit to the jury written questions susceptible of categorical or other brief answer or may submit written forms of the several special findings which might properly be made under the pleadings and evidence. . . ."

The Court chose to submit the matter as permitted by Rule 49 and, as already indicated, the Court is convinced from what transpired in this case that this is ample evidence that there was good reason for doing so. The alternative that the Court

could have employed was to submit the matter on a general verdict and, in that event, the jury would have been given Arkansas Model Jury Instruction 2111 as follows:

AMI 2111 (Modified)

## COMPARATIVE FAULT

The Court will now instruct you on what is referred to as the comparative fault law of Arkansas. For purposes of this instruction, you should consider that the word "fault" includes the legal theories of negligence, and supplying of a product in a defective condition which renders it unreasonably dangerous, all of which the Court has previously explained or defined for you.

If you should find that Danny Brewer was free of any fault which was a proximate cause of the occurrence, then Mr. Brewer is entitled to recover the full amount of any damages you may find he has sustained from any party or parties he is suing whose fault proximately caused those damages.

If you should find that the occurrence was proximately caused by fault on the part of Danny Brewer and also by fault on the part of one or more of the parties from whom he seeks to recover, then you must compare the percentage of fault of these parties.

If the fault of Danny Brewer was of less degree than the total fault of all of those parties he is suing whom you find to be chargeable with fault, then he is entitled to recover from them any damages which you may find he has sustained as a result of the occurrence after you have reduced his damages in proportion to the degree of his own fault.

On the other hand, if the fault of Danny Brewer was equal to or greater than the total fault of all of those parties he is suing whom you find to be chargeable with fault, then he is not entitled to recover any damages.

The Court submits that the Arkansas Model Comparative Fault Instruction copied above amply demonstrates the wisdom of the statement in 5A Moore's Federal Practice, ¶ 49.03[3], as follows:

Use of the special verdict eliminates the necessity for and use of complicated instructions on the law, which are normal concomitant of the general verdict. Complicated instructions have always been ludicrous and unfair: ludicrous in that only the naive can believe lay jurors are capable of absorbing all the legal elements involved, unfair in that lack of comprehension leads to confusion and ultimately, injustice."

In the words of another commentator, asking a jury to return a general verdict in a complicated case often results in a verdict which is "as inscrutable and essentially mysterious as the judgment which issued from the ancient Oracle of Delphi." Sunderland, Verdicts, General and Special (1920), 29 Yale L.J. 253, 258.

■ If the object of all of this is to see that substantial justice is done as often as possible, the Court cannot understand how it can be said with any force that it is "wrong" for the Court to ask the jury, which has heard four and one-half days of complicated testimony, much from experts with divergent views, three simple questions: (1) Was A negligent, yes or no? (2) Was B negligent, yes or no? (3) If both were negligent, which was the most negligent? In the Court's view, that procedure is more likely to produce "justice" than to expect lay jurors to attempt to sift through substantial conflicting testimony and to apply the somewhat complicated, even for lawyers, comparative negligence statute of Arkansas. We submit that it would be difficult for many lawyers to apply the provisions of AMI 2111 reproduced above to the facts of this case, and we think that it is naive to expect the lay jury which sat in this case to do so.

Since the law of Arkansas clearly is that, if a party claiming damages is guilty of

more fault than the person he is suing, he does not recover, we also think that it is eminently more fair for the jury to be asked only who was the most at fault and for the Court then to apply the law. Admittedly, this does not allow the jury to allow their sympathy for the plaintiff or their prejudice against the defendant, if that exists, to influence their decision, and we submit that this is the real concern of the plaintiff and his attorneys. If we assume that the attorneys for the plaintiff can, in fact, determine from the smiles on the faces of the jurors and other facial expressions and actions that they intended to award damages to the plaintiff in spite of the fact that they unanimously believed that he was guilty of 89% of the fault which caused the accident, we can only conclude that the jury intended to make such award, not because of what they thought the facts to be, but because they either had sympathy for the plaintiff or prejudice against the defendants. If that is the case, the system worked and the wisdom in submitting the case on special verdict was verified.

At the trial, when the jury verdict was returned, the attorneys for the plaintiff requested that the Court determine whether the result was what the jury intended and, presumably if it was not, that the jury be allowed to change its verdict to express what was intended. This is exactly what was done in the Arkansas case of *L. R. Argo v. Joe Blackshear, et ux.,* 242 Ark. 817, 416 S.W.2d 314 (1967). While we recognize that state law relative to the giving and application of special verdicts is not necessarily controlling (Wright, Miller & Cooper, Federal Practice & Procedure: Civil § 2502), we believe that the Arkansas case directly on point is particularly persuasive. That case involved the death of an eight-year old pedestrian who was struck by an automobile driven by defendant. The matter was submitted to the jury on a special verdict as permitted by Ark.Stat.Ann. § 27–1741.2, a statute then in effect in Arkansas which was almost identical to Rule 49 of the Federal Rules of Civil Procedure.

The jury answered interrogatories indicating that they found unanimously that the driver and the dead eight-year old girl were equally negligent, but then answered another interrogatory, fixing total damages to the parents at $18,000.00. At the request of counsel, the trial court stated:

I have to go rather carefully on this, this is very delicate, I want to know if it was the jury's finding and your intention that you intended for your answers to reflect that the plaintiffs in this case would not recover any amount from the defendant...

The jury foreman responded that the jury had intended for the parents to recover $18,000.00 and the remainder of the jury, by nods, affirmed. The judge then further inquired if that was their intention "even though you found that Phyllis Blackshear contributed 50% of the negligence to cause the accident." Again the answer was in the affirmative.

The Court then ruled that the interrogatories had "caused some confusion in the minds of the jury, especially as to the effect of their answers," and he proceeded to then read AMI 2102, the comparative negligence instruction to be used when the case is submitted on a general verdict. The jury was then given a general verdict form and it returned an award of $18,000.00.

In holding that the trial court had committed reversible error, and in reversing the case, the Arkansas Supreme Court observed:

This pointedly illustrates the value of interrogatories. Jurors honestly answer four relatively simple questions, not knowing the legal effect will be contrary to their personal wishes. Additionally, this situation justifies the rule that for the judge to specifically inform the jurors as to the effect of their answers on the ultimate judgment is reversible error.

For other cases in which the court has indicated that it would be error for the trial court to inform the jury of the effect of

their answers, see: *Thedorf v. Lipsey,* 237 F.2d 190, 193 (7th Cir. 1956); *Ruddy v. New York Cent. R. Co.,* 124 F.Supp. 470, 472 (D.C.N.Y.1954), *aff'd in part, rev'd in part,* (2nd Cir. 1955), 224 F.2d 96, *cert. denied,* 350 U.S. 884, 76 S.Ct. 137, 100 L.Ed. 779; *Bergstrom Paper Co. v. Continental Ins. Co.,* 75 F.Supp. 424, 427 (D.Wis.1943), *rev'd on other grounds* (7th Cir. 1949), 174 F.2d 636; *Cate v. Good Bros., Inc.,* 181 F.2d 146, 149 (3d Cir. 1950), *cert. denied,* 340 U.S. 826, 71 S.Ct. 62, 95 L.Ed. 607; *Harding v. Evans,* 207 F.Supp. 852, 855 (D.C.Pa.1962); *Walther v. Omaha Public Power Dst.,* 412 F.2d 1164, 1170 (8th Cir. 1969); *Chicago, R. I. & P. R. Co. v. Speth,* 404 F.2d 291, 295 (8th Cir. 1968); *McCourtie v. U. S. Steel Corp.,* 1958, 93 N.W.2d 552, 253 Minn. 501; *Gullett v. St. Paul Fire & Marine Ins. Co.,* 446 F.2d 1100 (7th Cir. 1971); *Jackson v. Ulrich Mfg. Co.,* 55 F.R.D. 473 (D.C.Pa.1972), *aff'd,* (3d Cir. 1973) 485 F.2d 680, *cert. denied,* 415 U.S. 982, 94 S.Ct. 1575, 39 L.Ed.2d 880.

In the *Speth* case, *supra,* the United States Court of Appeals, in a decision that is binding on this court, disposed of the issue raised by plaintiff's contention that this court should have questioned the jury to determine its intention. In that case, also one submitted on special verdict, the trial court questioned the jury in relation to its intention in answering interrogatories submitted. The jury answered one interrogatory, finding that the injured party was 40% negligent, and returned a verdict for $16,000.00.

The trial court then asked:

. . . is the figure inserted in Question Eight the total damage that you compute that the plaintiff has suffered or is this a net figure that you arrived at?

The foreman replied, "This is a net figure."

The trial court then stated:

Then I will have to send you back and ask you to complete the form as to total damage irrespective of deductions, contributory negligence or anything else.

The jury then retired and, not surprisingly, after five minutes, returned a $40,000.00 verdict.

The Court of Appeals, in reversing the trial court, stated, at 404 F.2d 295:

Thirdly, the court's questioning of the jury regarding the amount of their verdict, even on a special verdict form is impermissible. Although the jury system may not provide a means to achieve faultless justice, it is still the best instrumentality our democratic society has devised to decide an adversary proceeding. As such, a jury must be totally immune from any possible coercion or subtle pressures to increase or decrease its decided verdict by reason of the court's interrogation and direction to reconsider its findings.

\* \* \* \* \* \*

To allow a judge to question a jury's process of deliberate decision, even though done in good faith to avoid an apparent miscarriage of justice, could result in abuses far outweighing the infrequent inability to correct what may appear to be or is erroneous or a misunderstanding. And this must be true, even though reconsideration by the jury results in a verdict more accurately reflecting the jury's intentions. *It is for similar reasons that a jury in making special findings is best directed not to concern themselves about whether their answers will be favorable to one party or the other or what the final result of the law suit may be.* (citing cases) (emphasis supplied).

Then, in words that not only answer plaintiff's contention that this Court should have interrogated the jury about its intention, but are particularly appropriate in responding to plaintiff's request that the Court allow "after the fact" questioning of the individual members of the jury, the Court of Appeals, speaking through now Chief Judge Lay, stated:

If the court's interrogation of the jury as to the amount of the verdict could be

condoned in the instant case, then it would logically follow that the court or counsel could seek to correct a verdict on matters that are traditionally considered inherent in the verdict. If the verdict for $16,000.00 had been received, counsel could not have later shown by affidavit that the $16,000.00 was erroneously computed. Such a rule may seem harsh, but it is premised upon sound reasons of public policy. It is well settled that a jury's misunderstanding of testimony, misapprehension of law, errors in computation or improper methods of computation, unsound reasoning or other improper motives cannot be used to impeach a verdict. These matters all inhere in the verdict itself. (citing cases.)

The reasons for the rule are best stated in *McDonald v. Pless,* 238 U.S. 264, 267, 35 S.Ct. 783, 784, 59 L.Ed. 1300 (1915), where the United States Supreme Court said:

"But let it once be established that verdicts solemnly made and publicly returned into court can be attacked and set aside on the testimony of those who took part in their publication and all verdicts could be, and many would be, followed by an inquiry in the hope of discovering something which might invalidate the finding. Jurors would be harassed and beset by the defeated party * * *.

If evidence thus secured could be thus used, the result would be to make what was intended to be a private deliberation, the constant subject of public investigation—to the destruction of all frankness and freedom of discussion and conference."

The same principle applies as well to a trial judge's interrogation of the jury after they have returned a verdict. If a court could attempt to "correct" a verdict by general inquiry of a jury, even though the questioning is well-intended and seemingly innocuous on the surface, the protected cloak of privacy around a jury's deliberations would be permanently shattered.

We find that the jury in this case was not confused by the case being submitted on a special verdict, and that the jury and the interrogatories submitted did exactly the job that the law of Arkansas compels when the facts are as they were in this case. Plaintiff's motion for a new trial will be denied.

■ As indicated above, the plaintiff has also made the unusual request that the attorneys for the plaintiff be permitted to question the jurors to determine what their intentions were. This request is made in spite of the rather explicit provisions of Rule 606(b) of the Federal Rules of Evidence which provides:

(b) Inquiry into validity of verdict or indictment. Upon an inquiry into the validity of a verdict or indictment, a juror may not testify as to any matter or statement occurring during the course of the jury's deliberations or to the effect of anything upon his or any other juror's mind or emotions as influencing him to assent to or dissent from the verdict or indictment or concerning his mental processes in connection therewith, except that a juror may testify on the question whether extraneous prejudicial information was improperly brought to the jury's attention or whether any outside influence was improperly brought to bear upon any juror. Nor may his affidavit or evidence of any statement by him concerning a matter about which he would be precluded from testifying be received for these purposes.

In addition, Rule 26 of the Rules of the United States District Courts for the Eastern and Western Districts of Arkansas provides:

### JURY EXTRANEOUS PREJUDICIAL INFORMATION

In conformity with Rule 606(b), Fed.R. Evid., counsel should under no circum-

stances inquire as to a matter or statement occurring during the course of the jury's deliberations or to the effect of anything upon his or any other juror's mind or emotions as influencing him as to assent to or dissent from the verdict or indictment or concerning his mental processes in connection therewith. If counsel secures information that extraneous prejudicial information was improperly brought to the jury's attention or that outside influence was improperly brought to bear upon any juror, the information should be immediately communicated to the court with notice to opposing counsel. Any investigation as to improper influence upon the jury should be conducted under strict supervision of the court, and no juror should be contacted without express permission of the court and under such conditions as the court may prescribe.

Presumably, since these two rules are so explicit, and since the law is so well settled for the reason set forth in *Speth, supra,* it is presumed that the attorneys for the plaintiff must recognize that, under no circumstances, may a juror be asked about his mental processes except in relation to "whether extraneous prejudicial information was improperly brought to the jury's attention or whether any outside influence was improperly brought to bear upon any juror." As their sole authority for making this request, the attorneys for the plaintiff, somewhat surprisingly, rely on an article dated July 9, 1982, in the *Northwest Morning News,* a local newspaper, which is attached to the motion. If that is their support, it is no support. After briefly summarizing the facts of the accident, and the result of the jury verdict, the article reportedly quotes what appears to be two jurors who, according to the article, indicated that this is not "what we intended." One of the jurors was quoted in the article as saying that they intended to award Brewer 11% of his original damages. There is not even an inference to be gained from the alleged interviews reproduced in this article that

would lead anyone to believe that the jury was in any way influenced by "extraneous prejudicial information improperly brought to the jury's attention" or that "outside influence was improperly brought to bear upon any juror." If every word of the article is taken as true, all that it says is that the jury tried to do something that the law does not permit and tried to apply law that does not exist in Arkansas. The fact that they were mistaken about the application of the law, if that is a fact, is certainly not "extraneous prejudicial information" and was not "outside influence."

For the above reasons, the plaintiff's request that his attorneys be allowed to examine the jury relative to their deliberations and relative to their expectation as to the result of their unanimous verdict will be denied.